No. 66,324

STATE OF KANSAS, *Appellee,* v. DIANA LUMBRERA, *Appellant.*

(845 P.2d 609)

Opin-
ion filed December 11, 1992.

*Elizabeth Sterns,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Ricklin R. Pierce,* county attorney, argued the cause, and *Tamara S. Hicks,* assistant county attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MCFARLAND, J.: Diana Lumbrera appeals her jury trial conviction of first-degree murder (K.S.A. 21-3401).

The facts are summarized as follows. Defendant was the mother of a four-year-old boy named Jose. On April 30, 1990, the child's babysitter called defendant at work to advise the boy was vomiting and appeared to have a fever. Defendant left work to pick up the child. Later that day, defendant took the child to the emergency room of St. Catherine's Hospital in Garden City. Abdominal pain and vomiting were the presenting symptoms. Amoxicillin was prescribed. No life threatening condition was diagnosed and the child was sent home with his mother.

The following evening a telephone call was received by the hospital from a woman who did not identify herself, stating that her son's lips were blue and that he was not moving. Shortly thereafter, defendant carried the lifeless body of Jose into the hospital emergency room. Three observations were made at the time: (1) the child had petechiae (small purple spots on his face and eyelids); (2) no obstruction was present in the child's airway; and (3) food was present in his stomach. The presence of petechiae is an indication of asphyxia. The cause of death was initially determined to be asphyxia by smothering as opposed to being the result of natural circumstances. It was also noted at the time that the medical records indicated that defendant's five other children had died young in Texas and that their deaths were unattended. Results of the subsequent autopsy were consistent with the preliminary finding of death by smothering.

Defendant was questioned by police officers. She stated she had been the woman who had called the emergency room earlier. When asked whether she had smothered the child with a pillow, she replied it "wasn't with a pillow." Defendant was charged with and convicted of the first-degree murder of Jose. Other facts will be stated as necessary for the discussion of particular issues.

The bizarre circumstances involved in this case created a situation wherein extraordinarily careful judicial control was necessary to ensure a fair trial was had. There is merit in a number of the claims of trial error and abuse of judicial discretion. Even if no single error or abuse of discretion is sufficient to constitute reversible error, however, when viewed cumulatively in the to-

tality of the circumstances herein, we are convinced that defendant did not receive a fair trial. As we stated in *Taylor v. State,* 251 Kan. 272, Syl. ¶ 6, 834 P.2d 1325 (1992):

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant."

The evidence of guilt against the defendant herein cannot be said to be overwhelming. Hence, we must reverse the conviction and remand the case for a new trial. We turn now to a discussion of the issues presented.

## VENUE AND JURY SELECTION

Not surprisingly, there was a great deal of pretrial publicity concerning this case. This issue involves three separate points: (1) denial of change of venue; (2) denial of the request to sequester prospective jurors; and (3) denial of individual voir dire. Each of these points concerns the pretrial publicity herein. We shall first consider the change of venue point.

K.S.A. 22-2616(1) provides:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

In *State v. Ruebke,* 240 Kan. 493, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987), we discussed the issue of a change of venue based upon extensive pretrial news media coverage. Ruebke had been convicted of the murders of a babysitter and the two children for whom she was sitting. He argued that the pretrial publicity dictated a change in venue. We held:

"The determination of whether to change venue lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant, with the burden upon the defendant to show prejudice in the community, not as a matter of speculation, but as a demonstrable reality. *State v. Haislip,* 237 Kan. 461, 701 P.2d 909 (1985). The defendant must show that such prejudice exists in the community that it was reasonably certain he could not have obtained a fair trial. There must be more than speculation that the defendant did not receive a fair trial. The State is not required to produce evidence

refuting that of the defendant. *State v. Sanders,* 223 Kan. 273, 280, 574 P.2d 559 (1977).

. . . .

"Indicative of whether the atmosphere is such that a defendant's right to a fair and impartial trial would be jeopardized, courts have looked at such factors as the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated in other areas to which venue could be changed; the length of time which elapsed from the dissemination of the publicity to the date of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with the publicity complained of and its resultant effect, if any, upon the prospective jurors or the trial jurors; the challenges exercised by the defendant in the selection of a jury, both those peremptory and those for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn. Annot., 33 A.L.R.3d 17, § 2(a).

. . . .

"Media publicity alone has never established prejudice per se. The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. The small number of jurors dismissed by the court for cause and the effort of the judge to press no one into jury service who showed the slightest hint of prejudice established that there was no abuse of discretion in denying a change of venue. Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice. There was no abuse of discretion on the part of the court in denying the defendant's motion for change of venue." 240 Kan. at 498-501.

See *State v. Goss,* 245 Kan. 189, 193-95, 777 P.2d 781 (1989).

In this case, 129 veniremen were called. After the voir dire of 113 persons, 45 were passed for cause. The number of those excused on the basis of having formed opinions as a result of pretrial publicity was 41. The trial court ruled on the venue motion after completion of the voir dire and determined that the 45 remaining constituted a fair and impartial panel from which to select the jury. We have carefully reviewed the record and are satisfied that no abuse of judicial discretion has been shown in the trial court's denial of the defendant's motion to change venue. The defendant has not met her burden of proof to establish that defendant could not have received a fair trial in Finney County by virtue of the pretrial publicity afforded the case.

The other two points in this issue concern possible contamination of prospective jurors in the voir dire process. First, defendant contends it was improper to deny her request for individual voir dire of prospective jurors and, second, jurors who had been through the voir dire procedure should have been sequestered from those who had not.

The purpose of the voir dire examination is to enable the parties to select competent jurors without bias, prejudice, or partiality. The nature and scope of the voir dire examination is within the sound discretion of the trial court. *State v. Zamora,* 247 Kan. 684, 803 P.2d 568 (1990). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. Wagner,* 248 Kan. 240, 242, 807 P.2d 139 (1991). In determining whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate tribunals have the duty to make an independent evaluation of the circumstances. *Sheppard v. Maxwell,* 384 U.S. 333, 362, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966).

In order to place these points into perspective, it is necessary to first state the procedure followed. The prospective jurors were subject to voir dire in groups of 12. Prospective jurors not included in the particular panel of 12 were not sequestered during the questioning of the various panels. Defendant contends that prejudicial opinions on defendant's guilt expressed by various prospective jurors thus spread like a virus through all prospective veniremen.

The record reflects that the danger of contamination was particularly great herein as the key aspect of pretrial publicity concerned the deaths of the other children. Far more details of their deaths were disseminated in the media than were introduced at trial. Pretrial publicity included the following "facts," the truth or falsity of which is unknown.

1. Defendant's five other children died in Texas; their names, ages, and dates of death were listed as:

a. Joanna—3 months—November 30, 1976;

b. Jose Lionel—1½ months—February 13, 1978;

c. Melissa—3½ years—October 2, 1978;

d. Melinda—2½ years—August 17, 1982;

e. Christopher—5½ months—March 23, 1984.

2. Cause of death of some of the children was listed as asphyxia.

3. Ericka Aleman, a 2½-month-old daughter of a cousin of defendant's, died while in defendant's care on October 2, 1980.

4. Texas officials had reopened their investigations in the deaths of all of these children as a result of the Finney County murder charge.

A number of prospective jurors discussed the facts disseminated as to the other children and expressed the opinion there were just too many deaths to be a matter of coincidence and felt they could not be impartial. Interestingly, the following exchange occurred during voir dire:

"MR. QUINT [defense counsel]: Have any of you formed an opinion about this case? Go ahead, Mr. Sprague.

"JUROR: (Sprague) Maybe it doesn't make any sense. I've heard more opinions here today than I had before I came in and it bothers me.

"MR. QUINT: To be honest, it bothers me as well.

"JUROR: Bothers me in the selection of the jury, because I think there's an awful lot of prejudice that's being dumped on us in this process.

"MR. QUINT: Do you feel that that has—that you've been affected by that?

"JUROR: Probably no, it has not. In terms of being a juror it's not been, but it's disturbed me about the process.

"MR. QUINT: Okay. You've heard things here during this questioning that you were unaware of or didn't know was even being discussed. Am I—I don't want to put words in your mouth.

"JUROR: No, I think it's more in terms of the—I didn't realize the depth of the prejudice, the prejudging of it. In some cases I think the people have been excused just—they found a way to be excused and that's bothering me. I appreciate you hearing me."

The trial court knew that little evidence relative to the deaths of the other children would be introduced because of its own prior ruling on the motion in limine filed herein. Discussions by prospective jurors of these "facts" and their opinions thereon was rendered all the more prejudicial in such circumstances.

We find no abuse of discretion in the trial court's decision to commence voir dire in the manner it did, but conclude that it

should have modified the procedure when the risk of contamination through juror comments became a reality rather than just a possibility proposed by defense counsel. Examination of the milieu in which the voir dire was conducted convinces us that defendant's right to be tried by an impartial jury was jeopardized by the voir dire procedure utilized herein.

### ALLEGED STIPULATION AS TO QUALIFICATIONS OF AN EXPERT WITNESS

For her next issue, defendant contends that the trial court erred in holding that defense counsel had accepted the State's offer to stipulate to the qualifications of the defense's expert witness, Dr. William G. Eckert. The defendant called Dr. Eckert to the witness stand and started questioning him on his professional background. The following then occurred:

"MR. PIERCE [county attorney]: Your Honor, at this time the State of Kansas would stipulate that the witness is an expert in the field of forensic pathology, has written many articles and would stipulate to his expert qualifications.

"THE COURT: And would further stipulate upon proper foundation being laid this witness would be permitted to give his opinion?

"MR. PIERCE: Yes, Your Honor.

"THE COURT: Mr. Quint, you may proceed.

"MR. QUINT: Thank you, Your Honor."

When defense counsel proceeded to question Dr. Eckert on his qualifications, the State objected on the ground a stipulation had been entered into in that regard. The objection was sustained. Defendant contends the State's offer to stipulate was not accepted by the defendant but was nonetheless enforced by the court, and that she was prejudiced by her inability to place Dr. Eckert's nationally recognized qualifications before the jury. Dr. Eckert, a pathologist, performed a second autopsy on Jose and concluded the child had died from a natural cause—a viral infection.

As we held in *State v. Colwell,* 246 Kan. 382, Syl. ¶ 4, 790 P.2d 430 (1990): "An offer by the State to stipulate to the qualifications of an expert witness called by the defendant is merely an offer unless accepted by the defendant. Absent such acceptance, the defendant has the right to present the witness' qualifications to the jury."

Looking at the record in its entirety, the bulk of the qualifications of Dr. Eckert which defendant wished to introduce and which were admissible in nature did get before the jury. While not a substantial error, it was error for the trial court to have excluded the testimony based upon a nonexistent stipulation.

## DENIAL OF ADDITIONAL FUNDS FOR EXPERT AND INVESTIGATIVE SERVICES AND OF CONTINUANCE

Defendant next contends the trial court's denial of funds for an additional expert witness and for investigative services denied her the ability to prepare an adequate defense. Complaint is also made relative to the trial court's denial of a 60-day continuance from the trial setting.

K.S.A. 22-4508 provides, in pertinent part:

"An attorney other than a public defender who acts as counsel for a defendant who is financially unable to obtain investigative, expert or other services necessary to an adequate defense in the defendant's case may request them in an *ex parte* application addressed to the district court where the action is pending. Upon finding, after appropriate inquiry in the *ex parte* proceeding, that the services are necessary and that the defendant is financially unable to obtain them, the district court shall authorize counsel to obtain the services on behalf of the defendant."

In *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 7, 807 P.2d 86 (1991), we held:

"The authorization of funds for expert services necessary for an adequate defense in a criminal defendant's case lies within the sound discretion of the trial court. Appellate courts will not disturb the trial court's ruling unless the defendant shows prejudice to his or her substantial rights resulting from abuse in the exercise of the court's discretion."

Funds were provided to the defense to hire Dr. William Eckert, a pathologist. The defendant later requested additional funds to hire Dr. Thomas Noguchi, a nationally known pathologist, to review Dr. Eckert's findings.

In denying this request, the trial court stated:

"So, your request to go out and get Thomas T. Noguchi, M.D., Los Angeles, California, for the tune of 11 or $12,000 is denied; but that's not saying that, you know, if you can find a pathologist in consultation with Dr. Eckert that can at least view Dr. Eckert's findings as well as Dr. Vachal's [State pathologist performing the initial autopsy] findings, not for corroborative purposes, but only for surrebuttal, I will certainly look at it and consider it."

A request had also been made to hire an expert on viral infections. In denying that request, the court stated:

"However, there has been some evidence of the possibility of viral infection versus bacterial infection, and if you can give me the name of the expert that you are attempting to contact and whether or not those slides are available for his review, and that they can be made and the expenses involved, I would certainly give that serious consideration."

In ruling on post-trial motions, the trial court indicated it would have approved the hiring of a virologist if one had been requested.

On appeal, defendant claims error in the trial court's refusal of funds to hire an additional pathologist to review Dr. Eckert's findings. No claim is made that Dr. Noguchi was the only expert who could provide the needed expertise. The trial court's comments indicate it would have considered providing funds for hiring a pathologist at a lesser expense. Apparently, no further request was made.

Under these circumstances, was the denial of funds to hire Dr. Noguchi an abuse of judicial discretion? We believe not.

On appeal, defendant argues that the lack of "up front" money precluded trial counsel from locating a suitable substitute expert for Dr. Noguchi. There is no showing, however, that the trial court was ever made aware of any such difficulty or was requested to provide "up front" money. The record does not reflect that such a request would have been futile as the trial court's comments indicate a willingness to consider providing funds for the hiring of an additional expert.

The expert testimony from the pathologist was particularly crucial in this case, as cause of death was a prime issue. The State called a pathologist (Dr. Eva Vachal) in its case in chief as well as an ophthalmologist, both of whom testified that the petechiae could not be the result of bacterial or viral disease. Defendant called Dr. Eckert who attributed death to viral disease. In rebuttal, the State called three pathologists who testified there was no evidence of a life-threatening viral infection. Dr. Eckert then was the sole proponent of death from viral disease, and the weight afforded his testimony may have been reduced by the stipulation ruling relative to his qualifications and by a problem in his tes-

timony wherein he referred to having examined certain organs that were apparently not available for examination.

Defendant also complains of the trial court's refusal to provide funds for the hiring of an investigator to interview witnesses. The State listed 70 persons as witnesses herein, some of whom resided in Texas. In denying the motion, the trial court stated:

"Now, as to your motion that you have pending on the request for investigative services at this particular time there has been absolutely nothing that I have heard at this time which would warrant the expenditure of hiring Williams Investigation for the purposes of going down and interviewing anybody in Texas. You have the telephone available to you. There's nothing which shows me of any form of surprise or anything that may show exculpatory evidence in this instance. To me there's no—nothing that shows that those persons down there are bound to provide or secrete or hide anything. Kansas interviews and evidence and preservation and trial assistance, as far as I'm concerned, I know Williams Investigation. That's absolutely outside his area of expertise as far as trial preparation and preservation of evidence. There's a way that that can be done.

"Kansas interviews, Mr. Quint [defense counsel], at this particular time there's nothing that's been shown to me in any of the statements to date or any of the evidence that I've heard which shows that there needs to go out and start beating the bushes for witnesses. If you can show me that your client can't locate certain witnesses which you feel are going to preserve the integrity of your case or help you present some affirmative defenses and they cannot be located then I'll reconsider. But just to go out and talk to the State's witnesses, there's nothing in my opinion that says that necessarily investigative services should be expended. You use the telephone first and then we'll see where we go from there."

Clearly, the trial court believed investigative services could only properly be funded for the purpose of locating missing or unknown witnesses as opposed to interviewing witnesses whose names and addresses were known. The statute (K.S.A. 22-4508) is not so restrictive.

The time frame involved herein is also important. Defendant was arraigned on July 6, 1990, with jury selection set to commence September 16, 1990. On August 15, 1990, a pretrial conference was held. Included in the matters taken up was defendant's request for a 60-day continuance in order to prepare its defense, file motions, and interview the numerous State witnesses. Granting the continuance would have created no speedy trial problems as such delay would be charged to the defendant. The trial court denied the request, stating it believed that defense

counsel had enough time to prepare for trial and that a 60-day continuance would put the trial date into bad weather conditions unfavorable to a trial. We believe the refusal to provide funds for investigative services when coupled with the refusal to grant the requested continuance constituted an abuse of judicial discretion. If defense counsel was to be required, personally, to interview all witnesses, then more time to accomplish the same should have been afforded. Under the circumstances herein, the aggregate effect of the two rulings seriously hindered defense counsel's ability to prepare adequately for trial.

## MUNCHAUSEN SYNDROME BY PROXY

Defendant's next two issues concern the propriety of the State's reference to and testimony concerning the psychiatric term, Munchausen Syndrome by Proxy.

Some background information must be stated before proceeding to a discussion of these issues. The State asserted two possible motives for defendant having smothered her son, Jose. The first was to collect the insurance proceeds. The second was that defendant enjoyed being the object of attention and sympathy such as is afforded the parent of a critically ill, injured, or dead child.

The pertinent part of the State's opening statement is as follows:

"But secondly, the second motive that the State's going to show is a different type of motive. A motive that people are not necessarily accustomed to hearing about. Diana Lumbrera had a need to obtain sympathy, a need to obtain people feeling sorry for her and her problems that she had. I believe that that syndrome is called Munchausen Syndrome, and we'll have evidence to that effect, and it's specifically called Munchausen Syndrome by Proxy; and the way she could get sympathy the evidence is going to show is by showing that her child had terrible sickness, terrible illnesses, life-threatening and debilitating problems that occurred all the time, and she was just a person who had to carry this cross. She had a cross to bear and that people would feel sorry for her.

"And, the evidence that we're going to show is never more clear than the evidence you're going to hear from the Golden Plains Credit Union three employees. Those employees are Pam McBride, a loan officer; Pearl Wilson, who is one of the cashiers; and Tammy Klaus, the custodian for the loan records. And what the evidence is going to show from these individuals is simply this; number one, from the cashier Pearl Wilson that she had a savings account that never really fluctuated. It always stayed very, very low; but number two, Pam McBride who was her loan officer there would get these stories. To approve loans you have to give a reason for the

loan. And so, the loan officer would ask, why do you need this loan, what's going on? And the evidence is going to show that Diana Lumbrera said my child had leukemia. He's sick, he's terminal, or something to this effect.

"The evidence is going to show that because of those statements of poor health on the part of the child a loan was granted to Diana Lumbrera; and then ten days before the death of the child another loan, which says he's going to Mexico for treatment for his leukemia and for his problems, and on that trip to Mexico he got involved in a car accident and that car accident killed my father—that would be Diana Lumbrera—and it injured severely my son, Jose Lumbrera. However, the evidence is going to also show when you remember what I said earlier that the autopsy, no broken bones, no problems, no nothing, no leukemia, nothing. The reason for making those statements was two-fold; number one, to obtain money which was part of the motive; but number two, to obtain sympathy, to obtain attention to get sort of a feeling from other people that you've had a hard time; a sympathy junkie so to speak.

"Now, that evidence will also be brought to bear by the testimony of her direct supervisor at work, a woman by the name of Cyndi Brown, and Cyndi is going to come and testify that about a year earlier from the date of death she was told by Diana Lumbrera that her child had leukemia. Again, the evidence has already shown or will show that this child did not have leukemia, cancer or any sort of maladies such as that."

During the trial, the above referred to evidence concerning defendant's actions and statements relative to Jose was forthcoming.

As a part of the testimony of Dr. Lauren Welch, a surgeon present in the hospital emergency room when the body of Jose was brought in, the State introduced its exhibit No. 6, which was an article from the British Medical Journal entitled "Suffocation." Defense counsel objected thereto on the grounds the article did not qualify as a learned treatise and was both irrelevant and hearsay. The exhibit was admitted.

Dr. Eva Vachal, the pathologist performing the official autopsy herein, testified that, in conjunction with this case, she had been reading and researching on the psychiatric terms Munchausen Syndrome and Munchausen Syndrome by Proxy. Defense counsel objected to any testimony on the subject by the witness as the subject was outside the witness' area of expertise. The objection was overruled. The witness then testified as follows:

"Q. [By State's attorney] What is Munchausen Syndrome, a broad definition?

"A. A broad definition would be when an individual self inflicts or fakes an illness for the purpose of gaining sympathy or become the center of attention.

"Q. Now, what is Munchausen Syndrome by Proxy?

"A. That would be when a child—a parent would inflict on a child an illness or fake symptoms of an illness in order for the parent to be the center of attention or gain sympathy, and they gain that through the child; and the child is the one with the fake illness or the fake symptoms.

"Q. Okay. Now, does the parent create these fake symptoms for the child in Munchausen by Proxy?

"A. Yes."

There was no expert testimony attempting to prove defendant suffered from either syndrome. At the conclusion of the State's case in chief, on motion of the defendant, all testimony relative to either Munchausen Syndrome was ordered stricken and the portion of State's exhibit No. 6 referring thereto was deleted. The jury was then admonished as follows:

"When we had recessed on Thursday the State had concluded it's case in chief. Since that time Mr. Quint on behalf of his client has asked that I reconsider some of the rulings that I made last week, and after having reviewed the basis for those rulings and permitting certain evidence to come in I have sustained Mr. Quint's objections. As you'll recall when—right before we recessed last Thursday the State had recalled Dr. Vachal and asked Dr. Vachal to define the term Munchausen Syndrome and Munchausen Syndrome by Proxy.

"At this time there is no foundation having been laid by the State for the purpose of that, and you are to completely disregard Dr. Vachal's testimony as it has to do with that term, and you are to remove that term from any of your deliberations and strike that from your deliberations and considerations."

Defendant contends the error in admitting this evidence was not overcome by the striking of same and the trial court's admonition to the jury. We do not agree.

One of the State's two theories relative to the motive for the homicide was that defendant was, in the State's term, a "sympathy junkie" who derived gratification from being the object of sympathy arising from other peoples' reaction to illness, injury, or death of her child. The State had a right to present its theories. The whole Munchausen testimony was just to establish there was a recognized scientific name afforded to such a condition. There was no expert evidence offered that defendant suffered from such a condition. Such testimony in the overall picture was of a rather

minor significance not to be equated with, say, admitting a confession and then attempting to strike it from the minds of a jury with an admonition. Here, the jury was properly admonished. We must assume the jury complied with the trial court's admonition. See *State v. Pink,* 236 Kan. 715, 696 P.2d 358 (1985), *overruled in part on other grounds State v. VanCleave,* 239 Kan. 117, 119, 716 P.2d 580 (1986).

As a second related issue, defendant contends it was error for the State to refer to the Munchausen Syndrome in its opening statement. A similar issue was raised in *State v. Pink,* 236 Kan. at 724, where we held:

"Absent substantial prejudice to the rights of the defendant, there must be a showing of bad faith on the part of the prosecutor before relief may be granted as a result of a prosecutor's reference in his opening statement to matters not provable or which he does not attempt to prove during the trial. *State v. Woods,* 218 Kan. 163, 542 P.2d 319 (1975); *State v. Campbell,* 210 Kan. 265, Syl. ¶ 9, 500 P.2d 21 (1972). See also 1 ABA Standards for Criminal Justice, Prosecution Function, Standard 3-5.5. We find the prosecutor made a good faith effort to present all evidence alluded to in his opening remarks. The defendants have failed to meet their burden of showing bad faith."

Here, the State presented a theory that the obtaining of sympathy was a motive for the crime. The State introduced evidence showing defendant had previously fabricated stories of others' catastrophic illness and injury to obtain money and for no apparent reason other than sympathy. This is what it said it would do in its opening statement. It attempted to show such a desire for sympathy is termed the Munchausen Syndrome by Proxy. The jury was instructed that statements, arguments, and remarks of counsel are not evidence and that if any statements are made that are not supported by the evidence, they should be disregarded. As previously noted, all evidence relative to either Munchausen Syndrome was stricken and the jury properly admonished in regard to same. There is no showing of substantial prejudice to the defendant from the brief reference to the syndrome in the opening statement or bad faith on the part of the prosecutor. Error there was, but standing alone the issue raised relative to the Munchausen Syndromes does not rise to the status of reversible error.

## DEATHS OF DEFENDANT'S OTHER CHILDREN

For her next issue, defendant contends it was error to allow the prosecutor to refer in its opening statements to the deaths of defendant's five other children and to permit evidence thereof to be admitted at trial.

At the pretrial conference herein, the State indicated it intended to introduce evidence of the other children's deaths to show plan under authority of K.S.A. 60-455. The trial court ruled that: "[T]he prejudice outweighs the probative value and the State's request to use [K.S.A.] 60-455 as to preparation is denied." The trial court had before it at the time a chart which apparently gave some details of the other deaths, presumably names, ages, dates, places, etc. After making the preceding ruling as to K.S.A. 60-455, the following exchange occurred between the court and counsel:

"Now then, Mr. Quint [defense counsel], if in your case in chief you should raise anything which puts plan, motive, intent or preparation in dispute the State may at that time in proper rebuttal raise these issues. What I'm saying is, Mr. Pierce [prosecutor], if you call Dr. Vachal in your case in chief she can make no reference as to these specific cases. If there is evidence which was provided to her by statements given by Mrs. Lumbrera or upon other evidence to doctors or other evidence to law enforcement that there had been 6 previous unattended, unexplained deaths and she used that, that's fine; but getting into the particulars, no. If, Mr. Quint, in your case in chief you should raise any of this type of information or should in any way whatsoever open the door for any rebuttal testimony to come in in any medical testimony that you present it may open the door. I would look at it very carefully. By I, I'm talking about you yourself, Mr. Pierce and the Court.

"MR. QUINT: Court is speaking of any information that the chart refers to and was referred to in the testimony regarding the chart?

"THE COURT: Absolutely."

The defendant characterizes the court's rulings as excluding the subject of the other deaths in toto unless the subject was opened up in the defendant's case in chief, and, accordingly, the reference to the deaths in the State's opening statement and the evidence admitted of same in the State's case in chief were in violation of the court's rulings and thus erroneous. The State contends the trial court only excluded specific references to who died, when, where, etc., and did not exclude a general reference. The rulings

are unclear but it appears that the court anticipated that some evidence could well come in through Dr. Vachal in the State's case in chief.

Before proceeding further, let us examine just what was before the jury on this subject. The reference in the State's opening statement is as follows:

"The evidence is going to show that Dr. Michael Shull went out after pronouncing the child dead and talked with Diana Lumbrera, and that she fainted and that he was concerned about her health. The evidence is going to show that he opened up the medical history file [of] Diana Lumbrera and tried to determine if she had any medical problems that he needed to worry about and found that she had a history of having 5 children and all 5 of those children had died.

"MR. QUINT: Your Honor, objection. I think we dealt with an issue in our motion—

"THE COURT: Objection is overruled.

"MR. PIERCE: Now, the evidence is going to show that Dr. Michael Shull with this history became suspicious and decided to call law enforcement, and Melissa Peterson of the Garden City Police Department responded after members of the Garden City Police Department dispatch team, the 911 number if you will, received calls from the hospital and basically Melissa Peterson, our first witness, was assigned to do the initial investigation; and she talks to Dr. Michael Shull and gets his opinion."

Officer Peterson was called and testified, *inter alia,* that as the first officer on the scene she was told by Dr. Shull that police were called because he was suspicious of Jose's death as a result of learning of the other five deaths. This testimony was objected to and struck because Dr. Shull was the person who should testify to his own actions. Dr. Shull then testified along the lines outlined in the opening statement. The defendant objected, but the trial court held its pretrial ruling did not extend to this testimony. Then, Detective Kendall Elliott testified defendant told him she had had five other children who had died and had been vague as to names and dates. This testimony was very brief and gave no specifics.

The trial court's ruling is rather unclear about just what limitations were being placed on evidence relative to the other deaths. By virtue of the trial court's rulings on the various objections, it is clear that it did not believe the State had exceeded the limitations imposed, either in its opening statement or in the limited evidence introduced on the subject. Under such circum-

stances, we conclude the bad faith requirement relating to remarks in opening statements has not been met. Defense counsel's objections all go to the evidence and to statements exceeding the judicially imposed limitations, rather than to the statements themselves being in any way improper. Additionally, one unobjected to reference to the deaths was contained in the autopsy report which was before the jury.

Regardless, however, of whether or not such evidence should have been admitted, there is another difficulty. No limiting instruction was given defining the purpose for which the jury could consider the evidence. Without such an instruction, such evidence was a loose cannon in the case. The jury was free to conjecture and speculate as to the other deaths and factor in these conjectures and speculations in determining defendant's guilt or innocence in the death of Jose. As will be recalled, no specific details of the other deaths were introduced in accordance with the court's rulings. Only the general statements that the five previous deaths had occurred was before the jury. The jury, thus, had few facts relative to the deaths before it but unlimited opportunity to speculate on what may or may not have occurred. Given the bizarre facts herein, at the very least, a limiting instruction should have been given.

## REFUSAL TO INSTRUCT ON
## INVOLUNTARY MANSLAUGHTER

Next, defendant contends it was error not to instruct on involuntary manslaughter as a lesser included offense.

A trial court has an affirmative duty to instruct the jury on all lesser included offenses established by the evidence. An instruction on a lesser included offense must be given even though the evidence supporting the lesser offense may not be strong or extensive. However, the instruction need not be given if there is no evidence by which a rational factfinder might find the defendant guilty beyond a reasonable doubt of the lesser included offense. *State v. Stallings,* 246 Kan. 642, Syl. ¶ 3, 792 P.2d 1013 (1990).

Here, no instruction on involuntary manslaughter was given, nor was such an instruction requested or an objection to the

omission lodged. In fact, defense counsel agreed that such an instruction would be inappropriate.

The crime of involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to a felony, or in the commission of a lawful act in an unlawful or wanton manner. Involuntary manslaughter is a lesser degree of the crime of murder. *State v. Burnison,* 247 Kan. 19, 27-28, 795 P.2d 32 (1990).

The State's theory of the case was that defendant intentionally and with premeditation smothered the child. The defense theory was that the child died from a natural cause—a viral infection. On appeal, defendant argues that an involuntary manslaughter instruction should have been given. The argument goes like this: On April 30, Amoxicillin, an antibiotic, was prescribed for Jose. None of the drug was found in Jose's blood at the autopsy. Hence, the defendant's failure to give the drug may have caused Jose's death, which would constitute the crime of involuntary manslaughter. Critically lacking from such argument is any evidence admitted to the effect that failure to give Amoxicillin, prescribed for a bacteriological infection, could have any adverse effect on a viral infection. Thus, there was no evidence from which the jury could have concluded that the failure to give the child the drug caused his death. We find no merit in this issue.

## CLOSING ARGUMENTS

The trial court asked counsel if there was any need to make a record of closing arguments. Defense counsel stated that he believed there was a Supreme Court rule requiring the same to be on the record. The trial court responded "No. Absolutely not." Both counsel then agreed that the closing arguments need not be on the record.

The version of Supreme Court Rule 3.03 (1991 Kan. Ct. R. Annot. 14) in effect at the time of the trial herein provided, in pertinent part: "In a criminal case, the transcript shall include the trial, the instructions conference, closing arguments of counsel, and any hearing on a motion for a new trial."

Effective October 9, 1992, Supreme Court Rule 3.03 (1992 Kan. Ct. R. Annot. 15) was amended to provide, in pertinent part:

"(a) REQUESTING TRANSCRIPTS; DUTY OF APPELLANT; STIPU-LATION. When an appeal is taken in a case in which the appellant considers a transcript of any hearing necessary to properly present the appeal, it shall be the duty of the appellant to request a transcript of such hearing within twenty-one days (21) days of the filing of the notice of appeal in the district court. Unless all affected parties stipulate as to specific portions which are not required for the purposes of the appeal, the request shall be for a complete transcript of any such hearing, except for the jury voir dire, opening statements and closing arguments of counsel, which shall not be transcribed unless specifically requested."

Rule 3.03 applies to *transcripts* of the record on appeal. There is apparently no rule specifically requiring closing statements to be on the record. However, a transcript obviously cannot be made of matters not on the record. Supreme Court Rule 3.04 (1992 Kan. Ct. R. Annot. 16) concerns the procedure to be followed in the absence of an official transcript, but such reconstruction is particularly difficult in the area of closing arguments.

In a high percentage of criminal appeals, the defendant's appellate counsel is a different person than his or her trial counsel. This is due in part to the existence of the Kansas Appellate Defender Office. Defendant's appellate counsel herein, of that office, contends that the absence of a record herein from which a transcript could be made prevents her from adequately representing her client.

Closing arguments, in criminal cases particularly, should be of record. We conclude it was error not to have the closing arguments of record herein. We need not determine the extent of prejudice resulting therefrom as we are reversing on the basis of cumulative error.

## DENIAL OF PROBATION

Defendant concedes that, absent a specific statute, the decision of whether or not to grant probation is a matter of judicial discretion and ordinarily not appealable. As we held in *State v. VanReed*, 245 Kan. 213, Syl. ¶ 1, 777 P.2d 794 (1989): "A decision whether or not to grant probation is exclusively a function of the trial court pursuant to K.S.A. 21-4603, and as a general rule a decision denying probation is not subject to appellate review."

Here, however, defendant contends the matter is appealable as the trial court did not exercise its discretion in denying pro-

bation. Support for this position is found in the rationale expressed by the trial court in denying the request for probation. The trial court stated:

"At this time I'm quite familiar with the provisions of K.S.A. 21-4601 which are the parameters that the Court must consider in imposing sentences and the tests that the Court must employ and look at, and also the public policy of this State as mandated by our legislature. I'm also quite familiar with K.S.A. 21-4603 as it has to do with authorized dispositions on sentences for felonies; but I'm also very familiar with K.S.A. 22-3717 which says parole eligible release hearings, et cetera, and it states under subparagraph [b] thereof an inmate sentenced for a class A felony including an inmate sentenced pursuant to K.S.A. 21-4618—counsel, as you are aware that's the mandatory firearms statute—shall be eligible for parole after serving 15 years of confinement without deduction of any good time credits. *I am of the opinion since the legislature has been so clear in its statement as to eligibility for parole for a class A felony that that makes it very clear to me that the public policy of this state states anybody convicted of a class A felony should not be considered for probation. On that basis and my recitation of the law that I feel that the application for probation should be denied."* (Emphasis added.)

We conclude that the trial court's analysis was erroneous. Parole eligibility requirements set forth in K.S.A. 1991 Supp. 22-3717, by their very nature, apply only to persons serving sentences of imprisonment. The statute has no application to determination of whether or not probation should be granted. The trial court stated it did not consider probation herein because of 22-3717. Hence, judicial discretion was not involved in the denial of probation. Inasmuch as we are reversing the conviction and remanding the case for a new trial, there is no need to remand for resentencing.

## CONCLUSION

As previously stated, we have concluded the conviction herein must be reversed on the basis of our consideration of cumulative trial errors. By virtue of the extensive media coverage herein, both as to pretrial proceedings and the trial itself, we believe that the right to a fair trial before an impartial jury can only be assured by a change of venue for trial on remand. The trial court and counsel are directed to contact the departmental justice, who will then determine where the trial should be held and assign a judge to conduct said trial.

The judgment of the district court is reversed and the case is remanded for a new trial in accordance with the directions set forth in the opinion.