NOT DESIGNATED FOR PUBLICATION

No. 124,558

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

VINCENT R. JARMON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed November 18, 2022. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and MALONE, JJ.

PER CURIAM: Vincent R. Jarmon was convicted of one count of criminal threat based on an alleged interaction he had with the driver of a Wichita city bus. On appeal, he argues that the trial court erred in the instructions it gave the jury and in constructively denying his right to self-representation. And he argues that these errors cumulatively denied him his right to a fair trial. Nevertheless, because he voluntarily waived his right to self-representation and fails to show that the jury would have returned a different verdict absent the one instructional error that occurred here, we affirm.

FACTS

Jarmon was charged in Sedgwick County District Court with two counts of criminal threat. As to the first count, the complaint alleged that Jarmon threatened to shoot Teresa Bowens, a bus driver for the City of Wichita. As to the second count, the complaint alleged that, during the same incident, Jarmon told Bowens and another passenger, "'I am going to kill you both.'"

At Jarmon's jury trial, Bowens testified that while waiting at a stop on her normal route, a man approached her bus. After stepping on, Bowens noticed that he might be impaired, based on his wobbly stance and his possession of a small bottle of alcohol, which Bowens saw as he was digging in his pockets. Because she was worried he was too intoxicated to safely ride the bus, Bowens told him to get off.

At that point, the man started arguing with Bowens. She stated that he initially stepped off the bus after she asked him to but forced his way back on once she started to shut the door. Bowens stated that he then became aggressive, demanding she give him the bus fare and threatening her by saying he was going to shoot her and acting like he had a gun. Bowens testified that she told the man to get off her bus several more times and that he responded by again threatening to shoot her. Bowens stated that as this was happening, the man repeatedly reached behind his back into his pants as though he had a gun. But she never actually saw any weapon. Regardless, she said that she was ready to "fight for [her] life."

Bowens testified that a passenger sitting on the bus stood up and told the man to get off the bus while brandishing a stun gun. Bowens stated that the man then finally exited the bus, but before doing so he told both her and the passenger that he would remember their faces and that he would kill them the next time he saw them.

Bowens testified that her bus was equipped with video cameras and that these cameras were operating on the day of the incident. The State then played the surveillance video recording of the incident for the jury. This footage largely confirmed Bowens' description of events, although it was difficult to make out some of what the man was saying, and the man seemed to be trying to keep his pants from falling down, rather than reaching for a weapon.

Bowens testified that she waited to call the police until she got back to the bus station and that they interviewed her several hours later. A few months after that, police came to her house and presented her with a photo lineup. She testified that she "gave a brief description of the gentleman from two pictures and said you put these two together, you would have the identification." She also confirmed that she selected one of these two photos as the "one . . . [she] felt to be most accurate." Bowens clarified on cross-examination that in the photo she picked as the most accurate, the man did not have a goatee—which differed from the man who threatened her. Another photo in the lineup had a goatee, so she told the police if they combined the two pictures, that would look like the person she remembered. She explained that she "did not want to say that that was the photo when it wasn't exactly how I remembered, I was not going to prosecute someone that I was not for sure."

Notably, the State never actually had Bowens positively identify Jarmon in court as the man who had threatened her. Nevertheless, the framing of its questions to her implied that she had. While the State used generic terms to refer to the man who threatened Bowens in most of its questioning of her, it identified Jarmon as her assailant in its questions several times. For instance, after asking Bowens a string of questions identifying her assailant in generic terms, the State asked, "[W]ere you able to get Mr. Jarmon off the bus at that point?" The State similarly identified the man who threatened her as Jarmon in the framing of its questions four other times during its direct examination of Bowens.

3

The jury next heard testimony from Wichita Police Officer Ryan O'Neil, who interviewed Bowens several hours after the incident. He testified that she described the man who threatened her as 6' 3", 170 pounds, with black pants, short hair, and a black and silver goatee. He also testified that Bowens told him that although the man threatened to shoot her, she did not actually believe that the man had a gun, and that he was so drunk that she believed he may not even remember the incident.

Wichita Police Officer Truman Wiles, who presented the photo lineup to Bowens, testified next. He stated that Bowens paused when looking at picture number two but that "all she would tell me is this picture looks more fitting, kind of suggesting to me that this looks more like the suspect from that day." Picture number two was a picture of Jarmon. Wiles testified that Bowens would not give a definite number as to how sure she was. He said that when he asked her to rate her confidence in the identification, she "started to tear up and get really emotional when she was looking at—pointing at number two, but she said she didn't feel comfortable giving . . . a number." He said that she explained her hesitancy on the basis that the face was "a little bit chubbier" than she remembered and that he had different facial hair. She told him it would be more accurate if you took the goatee from picture number one and put it on number two. The photo lineup itself was also admitted into evidence.

The jury next heard from Wichita Detective Maryanna Hoyt. She testified that in the process of investigating the case, she pulled still photos from the bus surveillance footage and sent them out to all commissioned officers. An officer who saw the photos responded back that he recognized the individual as someone who frequented the Lord's Diner—a charity that provides free meals to the homeless. Jarmon was later located at that location and confronted with photos of the incident. After Jarmon confirmed to the officers it was a picture of him, he was arrested and questioned. Hoyt testified that, before the interview started, Jarmon told her he was an alcoholic and had drunk two pints that day. She testified that he told her he did not remember the incident but admitted that the

4

photographs and video appeared to be him. She said that Jarmon denied threatening anyone on the date of the incident but admitted that it could have happened without him remembering due to his alcoholism. The still photos from the bus surveillance footage and a video recording of a portion of Jarmon's interview with police were admitted into evidence.

Finally, Jarmon testified in his own defense. He denied that he was the man depicted in the video and stated that he was intoxicated during his interview with Detective Hoyt. He also testified that the video and pictures that the detective showed him in the interview were different than those displayed in court.

The jury convicted Jarmon of the first count of criminal threat but acquitted him of the second. The trial court sentenced him to 17 months in prison.

Jarmon timely appeals.

ANALYSIS

*Did the trial court err in failing to give an eyewitness identification instruction to the jury?*

Jarmon first claims that the trial court erred in failing to give the jury a cautionary instruction regarding Bowens' eyewitness identification of him as the man who threatened her.

Our Supreme Court has strongly recommended the use of pattern instructions unless the facts in a particular case require modification. *State v. Mitchell*, 294 Kan. 469, 476, 275 P.3d 905 (2012). Additionally, the court has approved PIK Crim. 4th 51.110 (2020 Supp.) as an accurate description of the factors a jury should consider regarding the reliability of an eyewitness identification. See *State v. Moore*, 302 Kan. 685, 704-05, 357

5

P.3d 275 (2015). Here, the instruction was appropriate as a matter of law because this was a criminal trial featuring an eyewitness identification.

The State argues that an eyewitness identification instruction was not required here. Alternatively, the State argues that Jarmon has not shown the jury would have reached a different verdict even if the instruction was given.

Jarmon concedes that he did not raise this issue below but argues that we can nonetheless review this claim for the first time on appeal.

K.S.A. 2021 Supp. 22-3414(3) provides that no party may assign as error the failure to give an instruction, absent a timely and specific objection, unless the instruction or failure to give the instruction is clearly erroneous. Accordingly, Jarmon's failure to raise this issue before the trial court does not preclude us from considering his claim, but he must demonstrate clear error to be entitled to relief. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

In reviewing claims of instructional error, appellate courts apply a multi-step analysis:

> "'(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
> '(2) considering the merits of the claim to determine whether error occurred below; and
> '(3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.'" *McLinn*, 307 Kan. at 317.

See also *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012) (listing four steps).

At the first step, a reviewing court exercises an unlimited standard of review. At the second step, the reviewing court determines whether the instruction was legally and factually appropriate. In determining whether the instruction was legally appropriate, the reviewing court uses an unlimited standard of review. In determining whether the instruction was factually appropriate, the reviewing court must view the evidence in the light most favorable to the defendant. *Plummer*, 295 Kan. at 163. At the third step, the reviewing court exercises an unlimited standard of review, examining the record as a whole. *State v. Dobbs*, 297 Kan. 1225, 1237, 308 P.3d 1258 (2013).

We concede that an eyewitness identification jury instruction was legally and factually appropriate here.

Because Jarmon did not request an eyewitness identification jury instruction or object to the omission of such an instruction, Jarmon must demonstrate that the failure to give this instruction was clearly erroneous. See K.S.A. 2021 Supp. 22-3414(3).

*Was the failure to give an eyewitness identification instruction clearly erroneous?*

Having established that the proposed instruction was legally and factually appropriate, next, Jarmon must show that the failure to give the instruction was clearly erroneous to be entitled to relief. To show clear error, a defendant must firmly convince the reviewing court that the jury would have reached a different verdict had the instruction been given. *State v. Owens*, 314 Kan. 210, 235, 496 P.3d 902 (2021).

Jarmon argues that without the guidance of an eyewitness identification instruction, the jury lacked the tools to properly weigh the identification and likely attached greater weight to the identification than it should have. He further argues that, although defense counsel highlighted the inconsistencies in Bowens' testimony on cross-examination, this did not counteract the failure to give a cautionary instruction. He argues

that if the jury had been given the instruction, there is a possibility that the jury would have returned a different verdict.

As the State points out, however, the other evidence in this case was damning and would not have been undermined by a cautionary instruction. For example, Jarmon confirmed to the police that he was the man in the video. Also, Detective Hoyt interviewed Jarmon about the incident. Hoyt testified that, before the interview started, Jarmon told her he was an alcoholic and had drunk two pints that day. She further testified that he told her he did not remember the incident but admitted that the photographs and video appeared to be him. Although she testified that Jarmon denied threatening anyone on the date of the incident, she further testified that he admitted that it could have happened without him remembering due to his alcoholism. The still photos from the bus surveillance footage and a video recording of a portion of Jarmon's interview with police were admitted into evidence.

Finally, the jury watched footage of Jarmon's interview as well as a video of the incident. The jury's ability to independently assess this evidence, along with the fact that Jarmon's counsel highlighted the inconsistencies in Bowens' identification, cut against Jarmon's attempt to show that the jury would have reached a different verdict if it had been instructed on the reliability factors under the cautionary instruction. Jarmon's arguments, however, have done little to obscure the damaging influence that this other evidence would have had on the jury.

Accordingly, we conclude that Jarmon has not met his burden to demonstrate clear error.

*Were the instructions the trial court gave the jury on criminal threat erroneous?*

Jarmon next claims that the instructions the trial court gave on each count of criminal threat were erroneous in that they failed to instruct the jury regarding the specific alleged acts constituting each charged count of criminal threat.

The State argues that the instructions given here accurately stated the law and did not constitute clear error.

Jarmon did not object to these instructions below. Nevertheless, as explained earlier, his failure to preserve this claim does not prevent us from considering it. But it means that he must demonstrate clear error to be entitled to relief. See K.S.A. 2021 Supp. 22-3414(3).

In determining whether the instructions given in a criminal trial were clearly erroneous, appellate courts employ an unlimited review of the entire record. *State v. Brown*, 306 Kan. 1145, 1164, 401 P.3d 611 (2017).

Jarmon notes that while each count of criminal threat he was charged with was based on a specific alleged statement, the jury instructions on both only restated the legal elements of criminal threat. Importantly, in his view, they did not inform the jury they had to find beyond a reasonable doubt that he made the specific charged statements.

Under count one, the complaint alleged that Jarmon "unlawfully threaten[ed] to commit violence, to wit: told [Bowens] 'I am going to shoot you', communicated with the intent to place another in fear." Under count two, the complaint alleged that Jarmon "unlawfully threaten[ed] to commit violence, to wit: told [Bowens] and another passenger 'I am going to remember both of your faces. I am going to kill you both', communicated with the intent to place another in fear."

The trial court gave identical instructions on each count at trial, telling the jury that to establish the charge of criminal threat, the State was required to prove that the "defendant threatened to commit violence and communicated the threat with the intent to place another in fear." This is an accurate statement of the law. See K.S.A. 2021 Supp. 21-5415(a)(1).

Citing to *State v. Trautloff*, 289 Kan. 793, 802-03, 217 P.3d 15 (2009), Jarmon argues that (1) a jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous and (2) when the State includes a particular factual allegation in the charging document, it is bound to prove that factual allegation.

Jarmon analogizes his case to *Trautloff* and argues that the jury instructions given here allowed the jury to convict him based on any threat to communicate violence, rather than the specific conduct alleged in the complaint. Jarmon claims that, based on the evidence presented in the case, the jury could have based his conviction on the statements alleged in the complaint, other statements presented in evidence, or Bowens' allegation that the individual reached behind his back, which she perceived as him possibly reaching for a gun.

In *Trautloff*, the court reversed a defendant's conviction for sexual exploitation of a child because the jury instruction on the crime's elements was broader than the elements alleged in the charging document. The State charged Trautloff with "displaying" a photograph or video of a child, but the instruction allowed the jury to convict Trautloff for "displaying, procuring or producing" such a photograph or video. And as the court noted, the evidence presented at trial of "procuring" or "producing" was direct and overwhelming, while the evidence of "displaying" was minimal and circumstantial. The court found that the instruction, by listing statutory elements that were not included in the charging document, was erroneous because it allowed the jury to convict Trautloff of sexual exploitation based on conduct that was not charged in the information. *Trautloff*,

10

289 Kan. at 801-02. And the court concluded that, under the circumstances of the case, Trautloff's substantial rights had been prejudiced by the erroneous instruction. 289 Kan. at 802-03.

The court has elsewhere characterized *Trautloff* as a part of a line of cases standing for the rule that "if an instruction adds alternate statutory elements of a crime that were not included in the complaint or information, the instruction is overly broad and, thus, erroneous." See *State v. McClelland*, 301 Kan. 815, 829, 347 P.3d 211 (2015). Although the *Trautloff* decision did not explicitly identify how the defendant was unduly prejudiced by the broader instruction, the court has since explained that the prejudice lay in lack of notice about the accusation that must be defended. See *State v. Hart*, 297 Kan. 494, 509, 301 P.3d 1279 (2013).

As the State points out, however, this case is dissimilar from *Trautloff* in that the jury instructions here did not *add statutory elements* that were not in the complaint. Instead, the jury instructions *omitted factual allegations* included in the complaint. And as the State notes, both our Supreme Court and another panel of this court have refused to find error where the jury instructions omitted specific factual allegations included in the complaint but otherwise accurately stated the law. See *Brown*, 306 Kan. at 1165; *State v. McFarland*, 60 Kan. App. 2d 1, 4, 6-7, 485 P.3d 178, *rev. denied* 314 Kan. 857 (2021).

In *Brown*, the defendant was charged with committing aggravated robbery based on the allegation that he demanded "drugs and cash" from the victim. 306 Kan. at 1165. The jury instructions omitted the specific allegation that he committed the charged crime by demanding drugs and cash, simply informing the jury that it had to find he had committed any overt act. Citing to *Trautloff*, Brown argued this instruction erroneously broadened the crime charged to include any overt act. The court rejected this argument, noting that Brown gave no explanation for how the discrepancy between the charging document and the jury instructions deprived him of due process. Absent any showing that

he had, for example, been unfairly surprised by the State's reliance on alternate conduct, Brown's claim was unpersuasive. Given this, and the fact that the instructions otherwise accurately stated the law, the court refused to find that the instructions were erroneous. *Brown*, 306 Kan. at 1165.

Similarly, in *McFarland*, another panel of this court refused to find error where the jury instructions omitted facts included in the charging document and instead used a generic statement of the statutory elements. In that case, like here, the defendant was charged with criminal threat. The complaint alleged that the defendant threatened a specific individual with an intent to place her in fear, but the jury instruction told the jury it only had to find that the defendant threatened to commit violence with the intent to place "another" in fear. After explaining that the question was whether the instructions informed the jury of every essential element of the charged crime, the panel noted that the statute does not require the State to prove the defendant intended to place a specific person in fear, so long as it proves the defendant intended to place "another" in fear. Because the instruction, which mirrored the statutory language, accurately reflected the elements of criminal threat and was not broader than the complaint, the panel concluded it was not erroneous. 60 Kan. App. 2d at 5-6.

The State argues that this case demands the same result. It claims that the instructions given here accurately stated the law and did not prejudice Jarmon, as the prosecution's theory at trial was consistent with the allegations in the complaint. As the State notes, the prosecutor expressly stated in closing argument, and again in rebuttal closing, that count one was based on Jarmon stating, "I am going to shoot you," while count two was based on Jarmon saying, "I'm going to remember both your faces, I'm gonna kill you both."

The State is correct. Unlike *Trautloff*, this is not a case where the State relied on different factual allegations at trial than those included in the criminal complaint.

12

Furthermore, the instructions here did not include different statutory elements than those listed in the complaint. Because the instructions' statement of the statutory elements was not broader than the elements alleged in the charging document and the prosecution's theory at trial was consistent with the allegations in the complaint, *Trautloff* is distinguishable from this case. Rather, similarly to *Brown* and *McFarland*, this case involved the omission of factual allegations included in the complaint from the instructions in favor of a generic statement of the statutory elements of the charged crime. As in those cases, we conclude that the challenged instructions accurately stated the law and that the trial court did not err in allowing their use.

*Did the trial court constructively deny Jarmon's right to self-representation?*

Jarmon next claims that the trial court committed structural error by constructively denying him his constitutional right to self-representation. The State argues no such error occurred here.

Several months after he was charged, Jarmon filed a pro se motion seeking to dismiss his appointed counsel. At the later hearing, however, Jarmon withdrew this motion. After several more months, Jarmon filed a second motion to dismiss his counsel, but once again withdrew it at the hearing. Jarmon eventually filed a third motion to dismiss his counsel. At the hearing on this motion, though, Jarmon told the trial court that he wanted to represent himself. After warning Jarmon of the dangers of proceeding to trial without an attorney, the trial court determined that Jamon waived his right to counsel and knowingly asserted his right to represent himself and allowed him to proceed pro se.

Several days later, Jarmon filed a motion requesting that he be allowed "to again view the video motions where [he was] held at gun point outside of [the] bus." At the hearing on this motion, the State submitted a list of the discovery given to Jarmon

13

showing that he was provided with the surveillance video recording of the incident shortly after electing to represent himself. Jarmon denied receiving the video.

After the trial court found that the State had indeed provided the video to Jarmon, as it was hand receipted as delivered to him at the jail, Jarmon alleged that there were multiple videos of the incident and he wanted "the video where [he] was held at gunpoint." Jarmon maintained that there was a second video showing that when the bus pulled up at the stop where he was waiting, there was a man holding a "Glock firearm" who prevented him from getting on the bus. The State maintained that there was only one video of the incident. After questioning Jarmon further, the trial court concluded that Jarmon was confused by the fact that the single video of the incident contained two separate camera angles.

On the eve of his jury trial, Jarmon filed a second motion seeking to compel the State to produce the video of him being "held at gun point outside a bus." When the trial court addressed this motion at the start of his trial, Jarmon told the trial court that he no longer wanted to represent himself since he had not received the video evidence. The State maintained that Jarmon had been provided with the video evidence but stated that it would provide him with an opportunity to view the video at that time as well, if the trial court so wished. The trial court found that Jarmon had been provided with the video evidence and gave Jarmon an opportunity to watch the video. After this Jarmon once again asked to be appointed an attorney. The trial court granted this request and continued his trial.

Before the start of the trial, the trial court confirmed with Jarmon's appointed counsel that the defense had been provided with all discovery.

14

Jarmon acknowledges that he did not raise this issue before the trial court but argues that consideration of his claim is necessary to prevent the denial of a fundamental right.

Jarmon is correct that while issues not raised below are generally not preserved for review, an exception applies where consideration of an argument is necessary to prevent the denial of a fundamental right. *State v. Beaman*, 295 Kan. 853, 856, 286 P.3d 876 (2012). And the Sixth Amendment right to self-representation is a fundamental right. See *State v. Bunyard*, 307 Kan. 463, 471, 410 P.3d 902 (2018) (violation of right to self-representation subject to structural error analysis).

Accordingly, we will consider his claim for the first time on appeal. See, e.g., *State v. Owens*, No. 112,472, 2016 WL 3144176, at *6 (Kan. App. 2016) (unpublished opinion) (considering unpreserved claim because right to self-representation is a fundamental right).

The extent of the right to assistance of counsel and the related right to self-representation is a question of law over which appellate courts exercise unlimited review. *Bunyard*, 307 Kan. at 470.

Jarmon claims that the trial court constructively denied his right to self-representation. Jarmon concedes that he explicitly waived his right to self-representation after initially asserting it but argues that this waiver was not voluntary because he was denied access to relevant video evidence before trial. He argues that the choice the trial court gave him—proceed to trial self-represented but unprepared or accept an appointed attorney and receive a continuance—was constitutionally offensive and represented a constructive denial of his right to self-representation on the trial court's part. And because denial of the right to self-representation is structural error, Jarmon argues that this error requires reversal.

15

As a necessary pretext to his argument, Jarmon first asks us to revisit the holding in *State v. Lowe*, 18 Kan. App. 2d 72, 75, 847 P.2d 1334 (1993), that, unlike the right to counsel, a defendant can waive the right to self-representation by failing to assert it. Jarmon urges us to instead find that the right to self-representation requires a voluntary, knowing, and intelligent waiver.

As the State points out, however, Jarmon ignores the fact that our Supreme Court has adopted the *Lowe* court's position that the right to self-representation can be waived by failing to assert it. See *Bunyard*, 307 Kan. at 470; *State v. Collins*, 257 Kan. 408, 414, 893 P.2d 217 (1995). We are duty-bound to follow Supreme Court precedent absent some indication the court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017).

Furthermore, Jarmon's contention that the trial court functionally undermined his right to self-representation by forcing him to choose between representing himself or going to trial adequately prepared misconstrues the facts and the law.

As the State notes, the fact that it is difficult to adequately prepare for trial while incarcerated and unassisted by counsel is one of the dangers and disadvantages of self-representation that trial courts are required to make a defendant aware of before accepting a waiver of the right to counsel. See *Bunyard*, 307 Kan. at 475-76.

And while Jarmon contends that he was denied access to relevant discovery until the day of the trial, it seems that he was provided with all the relevant discovery in a timely manner. His contention below was not that he was not provided with the video that was used against him at trial, but rather that the State was concealing additional evidence—a second video of the incident. The trial court, however, determined that Jarmon was confused, that only one video existed, and that Jarmon had been provided with all the relevant discovery in a timely manner. Jarmon provides no argument on

16

appeal as to how this finding was incorrect. Also, he does not explain what additional evidence he believes was withheld from him.

In short, the trial court did not functionally undermine Jarmon's right to self-representation because Jarmon was provided with all the relevant discovery well before trial. And any difficulty he may have experienced in preparing for trial was an inherent risk he accepted when he made the choice to proceed unassisted by counsel. Thus, we conclude that the trial court did not constructively deny Jarmon his right to self-representation.

*Did these errors cumulatively deny Jarmon his right to a fair trial?*

Finally, Jarmon claims that these errors, when considered cumulatively, denied him a fair trial.

Appellate courts utilize a de novo standard when reviewing claims of cumulative error. *State v. Brown*, 298 Kan. 1040, 1056, 318 P.3d 1005 (2014).

"'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial.'" *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 (1992). Logically, one error cannot support reversal under the cumulative effect rule. *State v. Nguyen*, 285 Kan. 418, 436, 172 P.3d 1165 (2007).

Because Jarmon has shown only a nonreversible error under one of his claims, we conclude that his claim of cumulative error is fatally flawed.

Affirmed.