No. 92,731

STATE OF KANSAS, *Appellee,* v. KENNETH M. COOK, *Appellant.*

(135 P.3d 1147)

Opinion filed June 9, 2006.

*Janine A. Cox,* capital appellate defender, argued the cause and was on the brief for appellant.

*Amy M. Memmer,* assistant district attorney, argued the cause, and *Robert D. Hecht,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Kenneth M. Cook appeals his jury conviction of one count of second-degree murder and his sentence of 15 years to life imprisonment.

For the 1992 murder of Charles Duty, Cook initially was convicted by a jury of first-degree murder and given a "hard 40" sentence. This court affirmed the conviction. *State v. Cook,* 259 Kan. 370, 913 P.2d 97 (1996). On appeal from denial of his petition for habeas corpus, the Tenth Circuit Court of Appeals determined that defendant's Sixth Amendment right to confrontation had been denied because the State had not exercised due diligence to secure a prosecution witness whose testimony at the preliminary hearing was admitted as evidence at the trial, then reversed and remanded with directions to grant the writ. *Cook v. McCune,* 323 F.3d 825

(10th Cir. 2003). The conviction and sentence from Cook's retrial of the murder charges are now again before this court.

Cook raises six issues in this appeal. Cook asserts the district court: (1) abused its discretion in denying Cook's motion to recall the jury; (2) erred in denying Cook's request for a psychological examination of David Rudell, the State's witness; (3) abused its discretion in denying his request for a continuance of the trial to develop evidence of Rudell's mental health; (4) abused its discretion in denying Cook's motion for new trial based on newly discovered evidence; (5) erred by failing to calculate what defendant's sentence would have been under the sentencing guidelines; and (6) enhanced his sentence in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

## FACTS

On September 13, 1992, a fisherman discovered a body in the Wakarusa River. The Shawnee County Sheriff was notified. The body was tied to a square metal beam that weighed about 50 pounds. Divers also found a piece of carpet in the river close to the location of the body.

An autopsy revealed that the man had been dead approximately 7 days and that he died as a result of bleeding from a bullet wound in the chest that damaged the main artery from the heart. A second bullet had entered his left upper back. The pathologist found no defensive wounds and concluded the man had not been shot at close range. The recovered bullets were of a very unusual type. The autopsy also revealed that after death, to hide identity of the victim, the victim's teeth had been removed and patches of tattooed skin and subcutaneous tissue had been cut from each of the victim's upper arms. The body eventually was identified from fingerprints as that of Charles Duty, a/k/a Donnie Perkins, a/k/a Billy Ray Davenport.

At the second trial, David Rudell, whose testimony at the preliminary hearing had been improperly admitted in the first trial, testified that Cook shot Duty on September 7, 1992. Rudell stated at that time he lived on Orange Street in Baldwin, Kansas. Cook and Beth Hebert had moved in with Rudell 2 or 3 days prior to

September 7. They had moved from a small house on Lime Street in northeast Topeka. Duty had lived with them in the small house for a very brief time.

Around noon on September 7, Rudell drove Cook and Hebert in his pickup to the house on Lime Street to move their furniture. Cook had a gun. Cook informed Rudell there might be a confrontation with Duty because Hebert had previously stolen pills from Duty. Duty had AIDS, and on September 1, he had obtained a prescription for 400 tablets of the narcotic, Hydrocodone, and 100 10-milligram tablets of Valium.

The gun Cook had belonged to Leonard Smith. It was a .31 caliber cap-and-ball pistol, a reproduction of an 1849 Colt pistol. The gun's projectile is a lead ball that is shot when black powder is ignited by the hammer hitting a firing cap. Smith loaned the gun to Cook in the spring of 1992. The first weekend in September Cook asked Smith for more ammunition. Smith provided the additional ammunition necessary to fire the gun.

Rudell further testified that when they arrived at the Lime Street house, Cook and Hebert got out of the truck. Rudell turned the truck around to load furniture. Rudell then got out of the truck. Hebert, who was standing outside a window of the house crying, stated, "He shot him."

Rudell entered the house. Gun smoke hung in the air. Cook was standing in the bedroom with the cap-and-ball pistol in his hand. Duty was half in and half out of the bed, tangled in the sheet. There was blood on the wall and a bloody wound on the left side of Duty's chest.

Cook dragged Duty's body to the garage where he pulled out Duty's teeth with pliers. Cook, Hebert, and Rudell then drove to the Tin Shed, a motorcycle business, and obtained a 6-to 7-feet long square steel beam. They returned to the Lime Street house. Cook wrapped Duty's body in a piece of carpet and then put the body in the back of the truck. Furniture was loaded on top of the body. They then drove to the Wakarusa River and parked at a spot used by fishermen. Cook took Duty's body and the steel beam down an embankment to the river. Using black nylon rope from the garage of the Lime Street house, Cook tied Duty's body to the

steel beam, then dragged Duty's body into the river until it sank below the surface. Before returning to Baldwin, Cook, Hebert, and Rudell returned to the Lime Street house, removed Duty's possessions, and then burned them.

Leonard Smith, owner of the cap-and-ball pistol, testified that, while visiting Smith at his trailer in Carbondale, Cook had stated that after he shot and killed a guy on Lime Street with the .31 caliber pistol, Cook informed Smith that he then tied the body to a piece of steel from the Tin Shed and threw the body in the Wakarusa River.

Beth Hebert testified that when Duty was killed, she had gone to the Lime Street house with Smith and Rudell to throw Duty out of the house and retrieve some furniture. Hebert testified that while Rudell was still in the truck, Smith went into the house. She then heard two gunshots. Hebert stated that they stayed with Duty's body for 4 hours. Hebert was aware that Duty took massive amounts of painkillers and other drugs. Hebert had previously purchased drugs from Duty. Hebert stated that after Duty's death, she got high on Oxycodones they had found in Duty's underwear. Eventually they moved the body to the garage. After dark they put it into the truck, then drove to the Wakarusa River.

In 1993 Beth Hebert told Darrin Busey, whom she became intimate with after they met at the Parkview Rehabilitation Center, that after she had stolen drugs from Duty, Cook shot Duty with a black powder-type of gun. During this conversation, Hebert never mentioned Leonard Smith's presence at the shooting to Busey.

## Failure to Recall the Jury

Defendant first argues that the district court abused its discretion when denying Cook's motion to recall the jury.

An appellate court reviews a trial court's order denying a motion to recall a jury for abuse of discretion. *State v. Kleypas*, 272 Kan. 894, 968, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002); *State v. Jenkins*, 269 Kan. 334, 338, 2 P.3d 769 (2000). We note that there are varying statements of the appropriate test for abuse of discretion. In *Kleypas*, this court stated the test of the trial court's abuse of discretion to be whether no reasonable person

would agree with the trial court. If any reasonable person would agree, an appellate court will not disturb the trial court's decision. 272 Kan. at 968. In *Jenkins*, the court stated the test of the trial court's abuse of discretion to be whether defendant can show that (1) an act of the jury constituted misconduct and (2) the misconduct substantially prejudiced the defendant's right to a fair trial. 269 Kan. at 338.

Although a showing of prejudice is said in a number of cases to be required, see *e.g.*, *State v. Fenton*, 228 Kan. 658, Syl. ¶ 1, 620 P.2d 813 (1980), and *State v. Garza*, 26 Kan. App. 2d 426, Syl. ¶ 4, 991 P.2d 905 (1999), this court noted in *State v. Goseland*, 256 Kan. 729, 736, 887 P.2d 1109 (1994), that the obstacle presented by K.S.A. 60-441 to such a showing is to establish how juror misconduct affected a verdict. We note that K.S.A. 60-441 bars evidence "to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict . . . or concerning the mental processes by which it was determined."

A case cited by defendant, *Irvin v. Dowd*, 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961), suggests a different emphasis. In *Irvin*, the prejudice on which the inquiry focused was the partiality of the jurors. The partiality of the jurors, of course, would prejudice the defendant, but the showing required was juror prejudice rather than its consequence. 366 U.S. at 723-24.

A discussion of the appropriate test is required. Our discussion includes consideration of another statement from *Jenkins*: "If a defendant's constitutional right has been violated during a trial, a judge's discretion to deny a motion for a new trial or a motion to recall a jury is limited. At this point, there is a greater reason for the judge to articulate the reasons for his or her 'discretionary' decision." 269 Kan. at 338. In practice, most issues in criminal appeals are stated as constitutional questions.

Juror affidavits. Cook contends that his Sixth Amendment right to trial by an impartial jury was violated when jurors became aware that this was a retrial. Cook's motion to recall the jury was supported by the affidavit of juror D.G.S., which stated: "During deliberations in this case, I heard another juror say that this case was

a retrial. That juror also said that Mr. Cook had been previously convicted of the same crime in that first trial." Cook asserts that the trial court abused its discretion by failing to recall the jury.

The State attached to its response the affidavits of four other jurors. D.S. stated: "To my recollection, during deliberations no one talked about this being a retrial, nor did anyone say Mr. Cook had been previously convicted. However, it became evident to me as the trial progressed, that this was probably a retrial. But this was not discussed among the jurors."

M.M. stated:

"I recall that during deliberations there was some momentary speculation in which some of the jurors said they wondered if this was a retrial, and if so, what was the outcome of that. Someone said it did not matter if it was. It was not discussed further. I do not recall the names of anyone who said these things.

"No one said they knew that this was a retrial. What was said was more speculation about whether this was a retrial. No one said they knew Mr. Cook had been previously convicted, and I had no idea of whether he was previously convicted.

"It did occur to me as the trial was going on that this was probably a retrial, mostly because of the fact witnesses were asked about their prior testimony."

K.D.L. stated:

"I recall the issue of this case being a retrial was brought up during deliberations. I recall it was mentioned early in the deliberations. The foreman said this case had to be a retrial, because the murder happened so long ago and we heard witnesses' testimony from a prior trial. He did say that we had to do this right. Nothing was said about any result of a prior trial, or contents of any prior trial. He did not present this as his personal knowledge, but more like he was drawing that conclusion from the fact the case was old and there was testimony from a prior trial."

G.L. attested:

"I recall that during deliberations someone said this was a retrial. I cannot recall his name.

"Nothing was said by anyone about any result of a prior trial.

"During the trial someone at work mentioned it was a retrial. Nothing was said about any result of the prior trial. I did not discuss this with the other jurors. I got the impression this was a retrial anyway during the course of the trial, from the fact that witnesses were asked about their prior testimony."

The trial court, citing *State v. Farrar*, 103 Kan. 774, 176 Pac. 987 (1919), as controlling Kansas case law, denied defendant's motion to recall the jury.

At the hearing in *Farrar* on a motion for new trial, Farrar had presented evidence that during deliberations one or more jurors had stated that at a former trial Farrar had been convicted of first-degree murder. "The former trial had been referred to in the course of the proceedings. Witnesses had been cross-examined with reference to testimony given at the former trial, and the fact that there had been a former trial was well known to the jury." 103 Kan. 774. Farrar relied "on the rule that evidential statements of a prejudicial nature made by a juror on his personal knowledge, and which would naturally and probably influence the verdict, furnish ground for the granting of a new trial, unless the [S]tate show[s] the accused suffered no prejudice." 103 Kan. at 774-75.

The *Farrar* court examined prior cases in which jurors' expressions of personal knowledge had been challenged by a defendant and concluded that degrees of materiality mandated appellate review on a case-by-case basis. 103 Kan. at 775-77. The *Farrar* court stated that in some cases the proof "might be so convincing that the court would have no hesitation in saying the statement made by the juror had no influence on the verdict" or that "it might be apparent that the statement of the juror merely augmented a superfluity of proof of guilt." 103 Kan. at 776. The *Farrar* court noted that in another case "the tension was such that the evidential statement of two jurors concerning the inoffensive character of the man killed" plus "other statements injected into the deliberations, may have overcome a lingering, reasonable doubt of guilt." 103 Kan. at 776-77. The court then stated that "the court might be able to say with confidence that the jurors who spoke were merely, in a way, confirming a conclusion from which the evidence in the case left no reasonable avenue of escape." 103 Kan. at 777. Regarding the circumstances in *Farrar*, the court stated:

"A statement of the nature of the verdict at a former trial is not evidential. The fact stated adds nothing to the evidence respecting any contested issue. It may not even be interesting. It may be a matter of common knowledge. It does not naturally or necessarily tend to corrupt the deliberations of a jury, presumably

regardful of their oaths and the instructions given by the court, and in any given instance it is the function of the trial court to determine whether or not it probably subverted their integrity and vitiated their verdict. In this instance this court agrees with the trial court that it is highly improbable the extraneous remarks influenced the jury to return an unwarranted verdict." 103 Kan. at 777.

The trial court acknowledged the lesson of *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842 (1987), with regard to recalling a jury, stating:

"'A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order.' *Walters v. Hitchcock,* 237 Kan. 31, 36, 697 P.2d 847 (1985)."

The circumstances of the present case were described by the trial court as:

"While this court would not describe defendant's Motion to Recall Jury 'a fishing trip,' this court does find that defendant has not met his burden to show the necessity for such order. It is clear that jurors speculated about whether the trial was a retrial and/or concluded during the course of the trial that it was a retrial. However, speculations and/or conclusions on the part of jurors are not misconduct. Juror [D.G.S.]'s affidavit does not provide any details regarding the alleged juror misconduct. The affidavit does not provide the identity of the juror who allegedly made the statement or is there specificity regarding how the juror obtained the information, *i.e.*, whether by deduction, speculation, outside sources, or personal knowledge. It is clear however that the jurors apparently figured out that it was a retrial despite the court's and counsels' best efforts to avoid any reference to or knowledge of a prior trial."

The trial court then reiterated the principle from *Farrar* that "information that the defendant had been convicted of the same crime in a previous trial 'does not naturally or necessarily tend to corrupt the deliberations of a jury, presumably regardful of their oaths and the instructions given by the court . . . .' *Farrar*, 103 Kan. at 777." The court noted that the jurors in this case had been

"instructed to disregard anything 'brought up outside the evidence.' This specific admonition was given to jurors during the course of this trial as a result of a juror telling the other jurors that he previously had owned the house at 107 N.E. Lime.

This court's instruction to the jurors was as follows: '. . . during the course of your deliberations if anything outside of the evidence in this case has been brought up to you, you are to absolutely and unequivocally disregard it.'

"This court not only gave the special admonition as stated above but also admonished the jury at each break and at the end of each day with the following admonition: '. . .your verdict when rendered must be based upon testimony and evidence presented here under oath, and not on rumors and unreliable evidence heard elsewhere.' "

## The trial court concluded:

"Therefore, even if Juror [D.G.S.] is correct and another juror stated that 'Defendant Cook had been previously convicted in another trial,' according to *Farrar*, that type of statement 'is not evidential,' does not necessarily 'tend to corrupt the deliberations of [jurors]' who will presumably follow their oaths and instructions given by the court, and is not jury misconduct."

On appeal, Cook, to support his argument, cites cases from other states and federal courts. Cook points to *Irvin*, 366 U.S. at 723, where the United States Supreme Court vacated Irvin's capital murder conviction, finding that Irvin was denied due process because pervasive and passionate media coverage of the crime had deprived him of an impartial jury. Cook cites *Irvin*'s statement that jurors must be able to set aside impressions and opinions and render a verdict based only on the evidence presented in court. 366 U.S. at 723.

It is the State's position that D.G.S.'s affidavit does not suggest that he or other jurors were unable to set aside impressions or opinions in order to render a verdict based solely on the evidence. Cook argues that information of a prior conviction cannot be benign and cites *United States v. Attell*, 655 F.2d 703, 705 (5th Cir. 1981); *United States v. Williams*, 568 F.2d 464, 470-71 (5th Cir. 1978); *Pettibone v. State*, 891 So. 2d 280 (Ala. Crim. App. 2003); *Hughes v. State*, 490 A.2d 1034, 1044 (Del. 1985).; and *Weber v. State*, 501 So. 2d 1379, 1383 (Fla. Dist. App. 1987).

We note that *Williams* involved the criminal prosecution of four law enforcement officers charged with depriving a man of his civil rights by beating him. After the officers were convicted in the first jury trial, the officers' motion for new trial was granted. On the evening of the second day of the second trial, a local television

news broadcast included a story about the trial which revealed that "[t]he four were convicted in the first trial last May." 568 F.2d at 466 n.2. The broadcast stated that the trial judge had overturned the verdict in the first trial because of erroneous testimony about the lawsuit and that the second trial was expected to last through the next week before going to the jury. When polled, five jurors admitted knowing of the report. Of the five, only two had actually read the report. All five jurors denied that the story would influence their decision in the present case.

In reaching its decision, the Fifth Circuit Court of Appeals distinguished cases in which potentially prejudicial publicity occurred before trial or in which pretrial publicity was combined with extensive trial coverage, stating that "[t]he 'during trial' cases, though fewer in number, contain greater opportunities for prejudice." 568 F.2d at 468. The Court of Appeals reasoned:

"[I]nformation reported during the trial seems far more likely to remain in the mind of a juror exposed to it, and he may be more inclined to seek out this information when he is personally involved in the case. [Citation omitted.] Moreover, exposure of potential jurors to news accounts before trial need not result in an aborted proceeding, since the problem can be cured by a continuance or change of venue. If the exposure occurs during the trial, however, the trial judge must squarely face the question of whether a fair trial is still possible. Consequently, a stricter standard should be employed in during-trial cases than in pretrial situations." 568 F.2d at 468.

The Court of Appeals declared it was "hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged." 568 F.2d at 471. Discounting the two jurors' beliefs they could disregard the newscasts and the salutary effect of the trial court's admonition to disregard things not heard in the courtroom, the Court of Appeals held that "the exposure of the two jurors to information regarding defendants' convictions at the first trial resulted in an unfair second trial." 568 F.2d at 471. The Court of Appeals concluded by noting that the case law it followed did not involve constitutional protections and the controlling principle was "applicable only in the federal courts." 568 F.2d at 468-69.

The other Fifth Circuit case cited by Cook, *Attell*, also involved media news reports during the second trial that defendant Attell had earlier been convicted on the same charges and the conviction set aside because of erroneous admission of evidence. In the second trial the judge refused to poll jurors to determine whether any of the jurors had been exposed to the news reports. The *Attell* panel referred to *Williams* as "teach[ing] that publicity which includes information that the defendant was convicted of the same charge at an earlier trial is a type of publicity which inherently poses a substantial risk of prejudice to a defendant if members of the jury are exposed to it." 655 F.2d at 705. Noting that this case differed from *Williams* because the first trial judge declined to poll the jury, the Court of Appeals stated:

"Although in the absence of a poll, it is impossible to determine whether the jurors were actually exposed to news reports containing references to Attell's first trial, here . . . we would have to speculate to conclude that no juror had seen or heard these accounts and therefore that Attell had not been prejudiced. . . . Therefore, the proper exercise of our supervisory powers requires that the conviction be reversed." 655 F.2d at 706.

The jury taint in *Williams* and *Attell* differs from that claimed in the present case. That difference merits discussion. In the federal cases, there were media reports of the prior convictions that were brought to the trial courts' attention by defense counsel before a verdict was reached. In *Williams*, a jury poll revealed that two jurors were exposed to the publicity; in *Attell*, no jury poll was conducted. In both circumstances, the verdicts were overturned—in *Williams* because jurors had been exposed and in *Attell* because they might have been exposed.

The question in the federal cases was whether the jurors had been previously prejudiced. In our case, in contrast, the issue arose as a result of a juror's postverdict affidavit regarding another juror's statement during jury deliberations. The question here is whether the juror's posttrial affidavit warranted a recall of the jury. With the scope of the inquiry in the federal cases restricted to prejudice, we note that neither of the federal court opinions cited the Federal Rules of Evidence, Rule 606(b), which governs inquiry into the validity of a verdict. That rule provides:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes." Fed. R. Evid. 606(b).

If a juror's affidavit had been the source of information about the news reports in *Williams* and *Attell*, Rule 606(b) would have permitted a juror affidavit regarding the extraneous prejudicial information being brought to the jury's attention. Moreover, if a juror's affidavit had been the source of information about another juror's statement that defendant previously had been convicted of the same crime, Rule 606(b) would not have barred it. The case law of other states and the relevant Kansas statutory rules of evidence and case law, which we now discuss, differ from the federal rule.

In *Pettibone*, the Alabama Supreme Court reversed the defendant's conviction "based on the prejudicial effect of the prosecutor's reference to a prior conviction for the same offense and the inadequacy of the circuit court's curative instruction." 891 So. 2d at 284. The prosecutor asked a defense witness, "Well, if this was so important, why didn't you run and tell that lawyer if you were trying to help [Pettibone] overturn his conviction?" 891 So. 2d at 282. Defense counsel's objection was sustained. The prosecutor then asked, "Wasn't [it] part of that hearing that you came to a few months back to overturn [Pettibone's] conviction—" 891 So. 2d at 282. The trial judge sustained another objection and admonished the jury: "Ladies and gentlemen of the jury, I instruct you to disregard the prosecutor's last two questions." 891 So. 2d at 282. Although the circuit court had promptly sustained defense counsel's objections to the prosecutor's questions, the Alabama Supreme Court stated that "the court's curative instruction was insufficient

to eradicate the prejudice caused by these questions." 891 So. 2d at 284.

In *Weber*, the jury foreman gave the following note to the bailiff during deliberations:

"During the deliberations, the six jurors took a vote as to whether we believe Mr. Weber shot Ricky Facen. After the vote, one of the jurors commented that Mr. Weber was convicted of these charges in a case previously and received a 99-year sentence that was later overturned on appeal for a technicality. The source from which the information came was the jury pool room yesterday . . . . Two people were discussing the case and the juror overheard the comment." 501 So. 2d at 1381.

The *Weber* trial judge informed the jurors he did not know whether the information they received was true or not. It was possible it was true. The trial judge then asked the jurors: "[W]ould that in any way affect your deliberations in this case? Would that affect your ability to determine the facts in this case, whether Mr. Weber was convicted of these charges at a prior time and reversed on appeal or not?" 501 So. 2d at 1382. The trial judge continued:

"In other words, every time a person wins an appeal it's another case, it's another trial and another jury, not the jury that originally heard the case, has to come in and decide facts.

"It is unfortunate that you people, whoever it was, after my admonishment of you exactly to that effect even listened to it. This case has taken all week.

"Now, you just tell me if anybody is going to be tainted by this information? That's the way it is. Facts don't change.

"Let me go down the list." 501 So. 2d at 1382.

After being questioned, the jury was allowed to resume deliberations. Referring to *Williams* as "the leading case," the Florida Court of Appeals stated:

"Courts which have confronted the discrete issue posed by the present case have uniformly concluded that the prejudice arising from the exposure of jurors to information that the defendant was previously convicted of the very offense for which he is on trial is so great that neither an ordinary admonition of the jurors nor the jurors' ritualistic assurances that they have not been affected by the information can overcome it." 501 So. 2d at 1382.

The Florida Court of Appeals noted that Weber's case for reversal was stronger than Williams' because the Weber jurors were told reversal was because of a technicality, were informed of defend-

ant's previous sentence, and received a stronger admonition. 501 So. 2d at 1384.

The only case cited by defendant that measured the jurors' knowledge of a defendant's previous conviction by a constitutional standard is *Hughes*, 490 A.2d 1034. *Hughes* differs from the present case. In *Hughes* the constitutional protection at issue was due process rather than the Sixth Amendment. See 490 A.2d at 1046. In *Hughes* the principal issue was the inadequacy of voir dire, which was contained in only 17 pages of the trial transcript and "did not allow an opportunity to observe the demeanor of any one juror." 490 A.2d at 1042.

In reaching its conclusion to grant a new trial, the Delaware Supreme Court stated that the "crucial factor" underlying its determination that an impartial jury was not empaneled was the inadequacy of defendant's attorney in voir dire of the jury panel in an extensively publicized retrial. 490 A.2d at 1040-41.

We note that in the present case, an exhaustive voir dire was conducted. In fact, Cook's appeal uses the thoroughness of the jury voir dire to illustrate how important the trial judge believed it was to empanel jurors who were not aware of the previous trial and conviction. *Hughes* supports Cook's argument in favor of the Delaware court's adoption of the *Williams* view that a juror's knowledge that defendant had previously been tried and convicted of the same crime "is extremely prejudicial information." 490 A.2d at 1044. The Delaware court concluded that under these circumstances, a presumption was created that denied defendant's due process for lack of an impartial jury and the State did not overcome the presumption. 490 A.2d at 1047-48.

Here, the State asserts that the foreign cases cited by Cook are contrary to the applicable Kansas law. According to the State, the premise of the foreign cases is that jurors' knowledge that defendant was previously tried and convicted for the same crime is inherently prejudicial. The State then points out that it is long established in Kansas cases that such knowledge "does not naturally or necessarily tend to corrupt the deliberations of a jury, presumably regardful of their oaths and the instructions given by the court." *Farrar*, 103 Kan. at 777.

The State then notes that the Kansas Rules of Evidence, codified in 1964, include two provisions, K.S.A. 60-441 and K.S.A. 60-444, which relate to an inquiry into juror conduct. K.S.A. 60-441 provides:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

K.S.A. 60-444 provides:

"This article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441 . . . where such testimony or statements are the subject of lawful inquiry in the action in which the juror is called to testify."

The evidence inadmissible under K.S.A. 60-441 is elicited by inquiry into the mental processes of the jurors in reaching the verdict; the evidence permitted by K.S.A. 60-444(a) is of juror misconduct having a material bearing on the validity of the verdict. See *State v. Franklin*, 264 Kan. 496, 498-99, 958 P.2d 611 (1998).

In *Franklin*, after an extensive review of the relevant case law, the court summarized it as follows:

"A juror may not impeach his or her verdict on any ground inherent in the verdict itself or divulge what considerations influenced him or her in arriving at the verdict. Inquiry may be made into the extrinsic matters of physical facts, conditions, or occurrences of juror misconduct, either within or without the jury room, which were material to the issues being determined." 264 Kan. at 503-04.

Franklin sought a new trial when a juror advised defense counsel that there was confusion over the court's instructions. Two jurors testified at the hearing on defendant's motion for new trial that they were in the minority in believing defendant not guilty because he acted in self-defense but, believing the instructions required a unanimous verdict, they had compromised on a lesser-offense verdict. The trial court denied the motion for new trial, and this court affirmed. 264 Kan. at 504-05.

On appeal, the *Franklin* court stated the issue as "whether the trial court correctly held that the testimony elicited as to confusion

over the instructions was inquiry into the mental processes of the jurors in the reaching of the verdict as prohibited by K.S.A. 60-441 or whether such testimony was juror misconduct having a material bearing on the validity of the verdict as permitted by K.S.A. 60-444(a)." 264 Kan. at 498-99. The *Franklin* court concluded that "the trial court correctly held that the testimony of the two jurors was improper under K.S.A. 60-444(a) as an effort to impeach the verdict by showing the mental processes by which the verdict was reached." 264 Kan. at 504.

*State v. Kaiser*, 260 Kan. 235, 918 P.2d 629 (1996), also illustrates the operation of the two statutes. Kaiser filed a motion for new trial based on the affidavit of a juror who stated that, contrary to her expressed opinion that Kaiser was not guilty, she had been pressured by other jurors to agree to a guilty verdict. The evidence of what the other jurors said and did was admissible under K.S.A. 60-444(a), but the evidence of what effect that conduct had on that juror's mental process in reaching the guilty verdict was barred by K.S.A. 60-441. 260 Kan. at 250, 252. The *Kaiser* court concluded under the circumstances, "the trial court properly denied the defendant's motion without recalling the other jurors." 260 Kan. at 252.

"The procedure to question the validity of a jury verdict is statutory. K.S.A. 60-444(a) states that a juror is not exempt 'from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict . . ., except as expressly limited by K.S.A. 60-441.' K.S.A. 60-441 prohibits testimony concerning the mental processes of the jury: 'Upon an inquiry as to the validity of a verdict . . . no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict . . . or concerning the mental processes by which it was determined.' " *Kaiser*, 260 Kan. 235, Syl. ¶ 4.

Here, Cook filed a motion to recall the jury based on the affidavit of juror D.G.S. D.G.S. attested that he heard another juror state that Cook had previously been tried and convicted of the same crime. D.G.S. did not state whether he was affected by the statement. Analyzing our circumstances in accord with *Kaiser*, the evidence of what the other juror said to D.G.S. was admissible under

K.S.A. 60-444(a). If there is no evidence of what effect that statement had on the affiant's mental process in reaching the guilty verdict, K.S.A. 60-441 is not applicable. If there had been evidence of what effect the statement had on affiant's mental process in reaching the verdict, that would have been inadmissible under K.S.A. 60-441.

Coupled with the *Farrar* principle that jurors' knowledge of a previous conviction for the same crime is not inherently prejudicial, the *Kaiser* analysis leads to the conclusion that the trial court properly denied Cook's motion to recall the jury. The essential question before this court is whether *Farrar* remains good law.

The State urges a somewhat similar analysis. To support its argument, the State cites *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 856 P.2d 906 (1993), for the proposition that, in order to merit consideration, D.G.S.'s affidavit must recount extrinsic misconduct. The State's position is that what is alleged by Cook does not constitute extrinsic misconduct consisting of specific personal knowledge. The State asserts that speculation, conjecture, or expressions of opinion by a juror do not constitute extrinsic misconduct; they are part of the thought processes of jurors. Following the statutory provisions, specific personal knowledge is admissible under K.S.A. 60-444(a) but speculation, conjecture, or expressions of opinion are barred by K.S.A. 60-441. The premise of the State's argument is flawed. D.G.S.'s affidavit describes specific personal knowledge. D.G.S. did not state that he heard another juror speculate, conjecture, or express the opinion that Cook previously had been tried and convicted of the same crime. D.G.S. stated that he heard another juror say the case was a retrial and that Cook had been convicted of the same crime in the first trial.

A curious aspect of Kansas case law, which appears in a case cited by the State in its brief but not argued before this court, is an old rule recently stated by this court in *Howell v. Calvert*, 268 Kan. 698, 703-04, 1 P.3d 310 (2000). There, the *Calvert* court approved a trial court's overruling a defendant's motion for new trial on an affidavit that alleged juror misconduct that consisted of hearsay statements. *Calvert* involved the injury of one and the death of another athlete, who were struck from behind by a truck

during an early morning workout route. The coach was aware that portions of the route selected were heavily trafficked and without sidewalks. In a posttrial motion, appellant Rothlisberger alleged that a juror had conducted an "investigation" of the route during early morning light levels. The *Calvert* court noted:

"An affiant alleges that a juror said she observed early morning light levels, and it was not as dark as plaintiffs had argued. Rothlisberger contends that the juror's investigation raised questions about the plaintiffs' theory of the case and would have affected the percentage of fault allocated to [a defendant]. A juror's independent investigation can be grounds for a new trial. See *Christopher & Son v. Kansas Paint & Color Co.*, 215 Kan. 185, 198, 523 P.2d 709 (1974), *modified on rehearing* 215 Kan. 510, 525 P.2d 626 (discussing several cases of jury investigation). However, Rothlisberger's argument here fails because the allegations are hearsay and a district court is not required to grant a new trial based on hearsay statements. *Hall*, 178 Kan. 489, Syl. ¶ 1. Rothlisberger did not present sufficient evidence of this allegation for us to conclude that the district court abused its discretion in denying a new trial." 268 Kan. at 704.

The present case comes to the court in a different posture. In *Howell*, the appellant contended her motion for new trial should have been granted on the basis of the affidavit. Here, Cook contends that his motion to recall the jury should have been granted on the basis of D.G.S.'s affidavit. The statement of and reason for the dispositive rule, however, suggest that it would apply as well to a motion to recall the jury. In *State, ex rel. v. Hall*, 178 Kan. 489, 289 P.2d 781 (1955), cited in *Howell*, the court quoted the following from *Cain v. Wallace*, 46 Kan. 138, Syl. ¶ 4, 26 Pac. 445 (1888): " '[I]t is not error for the trial court to overrule a motion for new trial, based upon affidavits of such hearsay statements.' " 178 Kan. at 490. Referring to the "salutary rule," the court stated:

"[T]his very case discloses the reasons for its pronouncement. For all the trial court knew, and for that matter all we know from the record before us, the statements made by the jurors to the assistant prosecutor might have been made in jest or for some other spurious reason. Of a certainty it cannot be said the state has established that they, or the matter to which they referred, were ever considered in the jury room or responsible for the verdict. If the state desired to establish misconduct on the part of the jury with respect to the particular matter in question, it was up to it to show that misconduct by affidavit, deposition or oral testimony of the jurors in the manner contemplated by our code of civil procedure.

Having failed to do so it cannot now successfully urge error in the overruling of its motion for new trial." 178 Kan. at 490.

Here, the relevant portions of the affidavit of juror D.G.S. consist of hearsay statements (as that phrase is used in *Howell* rather than as the phrase "hearsay evidence" is used in K.S.A. 60-460, in excluding evidence of a statement offered to prove the truth of the matter stated). If the *Howell* rule applies, our analysis need go no further. Here, some factors bearing on applicability of *Howell* need to be addressed. First, the State did not argue for its application. Second, the rule has been seldom cited, and *Howell* is the first instance in which the rule was extended to apply to the affidavit of a juror. We note that in *Cain*, an allegation of juror misconduct was "supported by the affidavits of two of the members of the corporation as to what one of the jurors told them after the trial had been concluded and the jury discharged." 46 Kan. at 144. In *Hall*, an assistant prosecutor testified at a hearing on the motion for new trial

"to the effect that after return of the verdict . . . three members of the jury had called his attention to the fact entries on a hotel ledger . . . were of such nature as to indicate the relatrix and a man, other than the appellee, had registered in and occupied the same hotel room on the same date she charged appellee with the wrongful conduct resulting in her giving birth to the alleged bastard child." 178 Kan. at 489-90.

Third, the cases cited in which the rule is stated were not criminal cases, with the possible exception of *Hall,* a criminal bastardy proceeding which allowed for the arrest of the father for the debt owed to support the bastard child. *Howell* is a civil personal injury and wrongful death case. *Cain* was an action to recover money owed for wheat sold to defendant. Fourth, no constitutional protections were at issue in *Howell, Hall,* or *Cain*.

As to the significance of constitutional rights claimed, Cook directs the court's attention to *Saucedo v. Winger*, 252 Kan. 718, 729, 850 P.2d 908 (1992), where the court stated:

"The Sixth Amendment to the United States Constitution sets forth an accused's right to a fair trial in a criminal action. Section 5 of the Kansas Constitution Bill of Rights guarantees the common-law right to a jury trial in civil actions. Implicit in the constitutional right to a civil trial is the right to a fair trial. The statutory

prohibition of K.S.A. 60-441 against impeachment of a jury verdict does not apply when a party claims that his or her constitutional right to a trial by jury pursuant to § 5 of the Kansas Constitution Bill of Rights has been violated by jury misconduct. See K.S.A. 60-444. Where the rights of a party are substantially affected by the misconduct of a juror, there is an opposing matter of public policy to be considered and a new trial may be granted. See K.S.A. 60-259(a). Improper conduct on the part of a juror is charged to the entire panel, as the jurors operate as a unit, and public policy demands that misconduct be discouraged and, insofar as possible, prohibited. We have found it advisable to permit inquiry into a juror's misconduct which comes to the attention of other members of the panel and may be verified or denied. *City of Ottawa v. Heathman*, 236 Kan. 417, 420, 690 P.2d 1375 (1984)."

The authority cited by the *Saucedo* court that K.S.A. 60-441 does not apply when a party alleges a violation of the Kansas Constitution is K.S.A. 60-444. We note that statute, however, contains no language to that effect. Here, Cook frames his issue as a violation of the Sixth Amendment to the United States Constitution.

In an attempt to dilute the significance of D.G.S.'s affidavit, the State directs the court's attention to the contents of other jurors' affidavits that indicate other jurors, without being told, formed the impression that it was a retrial based on references by witnesses in this trial to prior testimony and the date of the murder. The State contends that its affidavits show that any discussion of the matter of a retrial was speculation. Although the affidavits of the other jurors outnumber D.G.S.'s affidavit, they do not annul D.G.S.'s affidavit that another juror stated, not speculated, that Cook previously had been tried and convicted of the same crime. The State points out that D.G.S. did not attest that another juror stated *as a fact* that it was a retrial or that Cook was previously convicted. The State urges that this court view D.G.S.'s affidavit as reporting the same surmising referred to in other jurors' affidavits. This we cannot do. A plain reading of D.G.S.'s affidavit is that he heard another juror state that it was a retrial. This statement is not conjecture. In addition, D.G.S.'s affidavit varies from the other jurors' in that he was the only juror to report hearing that Cook previously had been convicted of the same crime.

Taking D.G.S.'s affidavit at full strength, we note that Kansas law is clear on this issue. To overturn the verdict, a showing of

prejudice is required. Cook has not satisfied that requirement because Kansas statutes limit the scope of inquiry. Here, the trial judge scrupulously articulated the reasons for her discretionary decision. The district court followed the law in overruling Cook's motion to recall the jury. Under the circumstances, no abuse of the trial court's discretion has been shown.

## Denial of Request for Psychological Examination of State's Witness

David Rudell was the State's key witness. Cook argues that the district court erred in denying defendant's request for a psychological examination of David Rudell. The issue of a trial court's failure to order a psychiatric examination of a non-complaining witness is one of first impression to be decided by this court. We note that issue was previously raised but not decided in *State v. Jones*, 267 Kan. 627, 636-37, 984 P.2d 132 (1999).

Rudell testified that in 1991 or 1992 he suffered disabling injuries in a motorcycle accident, left the hospital against medical advice, and experienced withdrawal from the morphine he had been given in the hospital. Rudell became depressed. Rudell's former wife and his doctor had Rudell committed to Topeka State Hospital in August 1991 as being potentially dangerous to himself. There, Rudell was evaluated by a psychiatrist, Dr. Jose Bulatao. A prior report from Dr. John Greene, a psychologist who had been treating Rudell, diagnosed him with schizoaffective disorder. Dr. Greene's report stated that Rudell had been smoking marijuana and experienced disorganized thinking, auditory hallucinations, agitation, and suicidal ideations. When talking with Dr. Bulatao, Rudell denied having hallucinations or being depressed, showed no psychotic symptoms, and was not suffering any mental illness. Based on his examination, Dr. Bulatao found Rudell to be coherent, alert, and appropriate in his remarks. Rudell was released from Topeka State Hospital 2 or 3 days later.

Whether to order psychiatric examination of a complaining witness is a matter of discretion for the trial court. *State v. Price*, 275 Kan. 78, 61 P.3d 676 (2003). Cook frames this issue as a constitutional question—Did the trial court's refusal to order a psychiatric examination of the witness David Rudell hamper Cook's right

to cross-examination so as to deprive Cook of his Sixth Amendment right to confront the witness against him? We note that Cook quotes a Utah case that applied an abuse of discretion standard of review, *State v. Calliham*, 57 P.3d 220, 225 (Utah 2002). Cook does not argue that our standard of review is not an abuse of discretion.

Citing *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003), the State contends that this issue is not properly preserved for appeal because Cook failed to request the trial judge make a preliminary finding as to Rudell's competency. *Williams* articulates the principle that an issue not presented to the lower court generally will not be considered on appeal. 275 Kan. at 288. But we note that the issue in *Williams* was whether the defendant should be allowed to withdraw his guilty pleas because the trial court incorrectly advised him of the maximum prison terms he was facing. There was no issue of competency raised in *Williams* and no mention of a procedural requirement of a preliminary finding on a witness' competency to testify.

Cook requested that the trial court order Rudell to submit to a psychiatric examination. The trial court denied Cook's request. The trial court based its denial of defendant's request on *State v. Gregg*, 226 Kan. 481, 602 P.2d 85 (1979), a case cited by both parties.

Gregg was convicted of aggravated sodomy and aggravated indecent solicitation of a child arising from two incidents involving Gregg and the complaining witness, an 8-year-old girl. In a case of first impression, this court affirmed the trial court's denial of defendant's motion for a psychiatric examination of the young girl. 226 Kan. at 485-90. The *Gregg* court held that "a trial judge has the discretion to order a psychiatric examination of the complaining witness in a sex crime case if the defendant presents a compelling reason for such examination." 226 Kan. at 489. The *Gregg* court concluded: "Even if a trial court finds a compelling reason for ordering the psychiatric examination, the further safeguard as to its admissibility remains." 226 Kan. at 489.

The factors Gregg urged in support of the examination were the girl's age, the seriousness of the crime, and a dearth of corroborating evidence at trial. The *Gregg* court noted that the defendant did not introduce facts "as to the child's mental instability, lack of

veracity, similar charges against other men proven to be false, or any other reason why this particular child witness should be required to submit to such an examination." 226 Kan. at 490. The *Gregg* court concluded that the defendant's motion was "a fishing expedition embarked upon in the hope something damaging and admissible in the trial would be unearthed." 226 Kan. at 490.

Cook next cites *Livingston v. State*, 907 P.2d 1088 (Okla. Crim. 1995), where a defendant's conviction of first-degree murder was reversed in part because the trial court had excluded records of the juvenile offenses and a contemporary psychological examination of Livingston's son, S.L. S.L. was the most damaging witness against his father. The principal ground for reversal of Livingston's conviction, however, was defense counsel's conflict of interest, relating to the problem of confidentiality with the psychological examination of a former client.

Livingston's defense counsel had represented S.L. in a juvenile proceeding. Under these circumstances, the court held that defendant's defense counsel was unable to effectively cross-examine S.L. to show bias because of information counsel gained while previously representing S.L. 907 P.2d at 1092. The Oklahoma court concluded that under such circumstances, Livingston was deprived of the effective assistance of trial counsel. 907 P.2d at 1092. In addition, Livingston successfully argued that his right to confrontation was violated because he did not have a "meaningful opportunity to cross-examine S.L. for bias." 907 P.2d at 1092. Under these circumstances, Livingston's conviction was reversed. 907 P.2d at 1095.

Cook cites *Livingston* for the principle that a criminal defendant has the right to meaningfully cross-examine witnesses against him or her. The present case is factually distinguishable from *Livingston*, where compelling a witness to submit to a psychological examination was not at issue.

More to the point is *Jones*, where the court stated: "No case has been brought to the court's attention in which the court actually discussed whether the *Gregg* rule should be extended to cases not involving sex crimes. Nor has any Kansas case been brought to the court's attention involving a request for evaluation of a noncom-

plaining witness." 267 Kan. at 636. Jones had urged this court to extend the rule to a noncomplaining witness, contending that Jones' rationale includes "any government witness who might fabricate testimony due to mental impairment." 267 Kan. at 636. The *Jones* court concluded that the defendant had presented no compelling reasons as to why the trial court should have ordered a State's witnesses to undergo psychological evaluations. 267 Kan. at 637.

In this case, the reasons offered by Cook as to why the trial court should have ordered Rudell to submit to psychological examination included the witness' hospitalization in 1991 and the psychologist's contemporaneous report of a possible schizoaffective disorder, drug use, disorganized thinking, and auditory hallucinations, Rudell's statements to defense counsel that "he was committed to Griffin State Hospital in Norman, Oklahoma, as a youth and was diagnosed as criminally insane" and that "he has trouble sequencing events," and Rudell's declining "to provide even a general account of his whereabouts the last ten years."

Here, there are two categories of reasons offered by Cook why witness Rudell should have been ordered to undergo psychological examination. Most of the stated reasons relate to Rudell's 1992 ability to accurately perceive the events surrounding Duty's death, Rudell's 1991 hospitalization and psychologist's report, drug use, disorganized thinking, auditory hallucinations, and his youthful commitment in Oklahoma. As to these factors, a 2003 psychological examination would have less bearing on this case than the 1991 evaluations available to defense counsel. Rudell's hospitalization in 1991 and Dr. John Greene's contemporaneous report were the subjects of extensive cross-examination of Dr. Bulatao. Because he had treated Rudell in 1991, Dr. Bulatao was in a better position to assess Rudell's mental condition at the time of Duty's death than any mental health professional examining the defendant nearly 11 years later.

Cook also cites *United States v. Brown*, 770 F.2d 768, 770 (9th Cir. 1985), for the proposition that a trial court's refusal to compel psychological testing of a witness who was extensively cross-examined concerning the witness' drug and mental problems was

appropriate. Here, not only was Rudell cross-examined concerning his drug use and mental condition, Dr. Bulatao also was cross-examined as to Rudell's drug use and mental condition.

In addition to the reasons relating to perception of the crime, several reasons—Rudell's trouble sequencing events and his declining to account for the previous 10 years—relate as well to the soundness of Rudell's memory. If these factors were meritorious, there might be utility in an updated examination. These factors are not creditable, however, because during cross-examination of Rudell, defense counsel asked, "Do you have problems with sequences, remembering sequences, things in sequence correctly?" Rudell, who had been testifying for seven pages of transcript about various places he had lived, responded, "I have traveled around quite a bit as you can see," and "[t]o sit down at one time and recall specifically, yeah, sometimes, and dates." Rudell then immediately denied having any problem remembering when Duty was killed.

We note that Cook cites no authority stating that trouble sequencing events or failing to meticulously recount the past 10 years constitute compelling reasons why the witness should have been required to submit to psychological testing prior to testifying. We conclude that the reasons offered by Cook are not compelling, like the issue in *Jones*, and we need not extend the *Gregg* rule.

## Denying Request for Continuance

Cook argues that the district court abused its discretion in denying his request for a continuance to develop evidence on Rudell's mental health. We note that in a criminal case, the decision to grant or deny a continuance is within the discretion of the trial court and its decision will be affirmed unless the trial court abused its discretion. *State v. Meeks*, 277 Kan. 609, 616, 88 P.3d 789 (2004).

The trial was scheduled to begin August 11, 2003. On August 5, defense counsel requested a continuance. The State opposed defendant's request. The trial judge denied the defendant's request, stating:

"It's clear to the Court that Mr. Cook is entitled to speedy trial and he voiced that he wanted that speedy trial and, in fact, initially was not willing to ask for any continuance, even though counsel had been appointed very late. Ultimately, when

the Court denied motions for dismissal a request was made, but the request was made for a very short time frame and the Court, in fact, did and I think counsel for the State moved, moved things around so that we could get this trial set for the 11th. I moved things around so we could get the trial set for 11th. Obviously, I think you all had asked initially for an August 4th date and you were willing to move to August 11th. However, at that point in time defense counsel and defendant were not willing to go any further. I mean, that was basically bottom line, that Mr. Cook would sign up until about that time but not any longer. I understand that, that there is information out there and that you would like to have it in order to try this case. I don't know how much of this would be information that the Court would let in or not, that's going to be an issue for a later date, but I think it's like a lot of situations in trial that if there is always another stone that you could look under, you know, that you don't want to leave any stone unturned and you want to continue to research and find all of the evidence that is available. But, in this situation we had—certain things occurred because of the time line and one of those really deals with Mr. Rudell and the fact that he is here on a material witness bond. He is sitting in the Shawnee County Jail. He's a private citizen who is not being held for a crime and I think I have some concerns about how to, on one hand insure Mr. Cook's due process in this whole proceeding, but I also have Mr. Rudell that I need to deal with and we have some checks and balances here. Mr. Cook wants Mr. Rudell here, is what I have been told by counsel and—several times and that without Mr. Rudell that there will be—certainly there would have been motions to dismiss this case for that reason. Mr. Rudell is now here and now we have other issues that have come about.

"And I understand the time frame, I don't believe that counsel really could have done anything differently. On the other hand, I think we have some other issues with regard to Mr. Rudell and I want to preserve Mr. Cook's right to have Mr. Rudell here and I don't believe that I can hold Mr. Rudell indefinitely in the Shawnee County Jail. So, for those reasons I am going to deny the motion for a continuance."

On appeal, Cook suggests that this court link the trial court's denial of the request for psychological evaluation of Rudell with the trial court's denial of a continuance. Defendant asserts, by pairing the two rulings, the matter is comparable to other trial court rulings and must be considered together.

In *State v. Lumbrera,* 252 Kan. 54, 64-65, 845 P.2d 609 (1992), the trial court had denied defendant funds for investigative services even though the State had listed 70 witnesses, including some out-of-state residents. The trial court later denied defendant's request for a continuance. In the circumstances of the case, the *Lumbrera* court concluded that "the aggregate effect of the two rulings" con-

stituted an abuse of discretion. 252 Kan. at 65. The circumstances of that case are that the mother of a 4-year-old boy, whose death resulted from asphyxia, was charged with the child's murder, and medical records showed that five of her other children had died young and unattended, some of asphyxia. There was a great deal of pretrial publicity as to the deaths of the other children. Defendant's request for a change of venue was denied. Defendant's request to sequester prospective jurors was denied, and individual voir dire of the jury panel was also denied. The trial court then erroneously prevented defendant from eliciting her expert witness' qualifications after the State had stipulated to the witness' qualification. In addition, information as to the five previous deaths of children was introduced to the jury without a limiting instruction. And, finally, no record was made of closing arguments. The *Lumbrera* court found that because the totality of the circumstances substantially prejudiced the defendant, the defendant had been denied a fair trial and reversed Lumbrera's conviction. 252 Kan. at 74. Here, Cook, unlike *Lumbrera*, does not argue that the totality of the circumstances were prejudicial to him.

To support his argument, Cook cites two appellate Kansas cases, *State v. Ly*, 277 Kan. 386, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004), and *State v. Anthony*, 257 Kan. 1003, 898 P.2d 1109 (1995). Cook recognizes that in neither of these cases the trial court's denial of a motion for continuance was found to be an abuse of discretion. Cook then urges this court to adopt the analysis applied in *Anthony* and asserts that the court's analysis in *Ly* is too restrictive.

Anthony had appointed counsel. Anthony was to be tried with his codefendant. Prior to trial, Anthony lost confidence in his court-appointed attorney. Anthony then hired an attorney to represent him and requested a 2-month continuance. The trial court refused to grant a 2-month continuance for the sole purpose of permitting the retained counsel to prepare for trial. After his conviction, on appeal, Anthony contended the trial court denied him his right to retain chosen counsel by not granting a 2-month continuance so his retained counsel could prepare for trial

The *Anthony* court noted that "although an accused must be provided a fair opportunity to obtain counsel of his or her choice,

this right cannot be manipulated to impede the efficient administration of justice. [Citation omitted.]" 257 Kan. at 1019. It observed that, under such circumstances, the court must balance factors to determine whether the trial court's action was fair and reasonable. The *Anthony* court observed that the factors to be considered include: "(1) whether a continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the fault of the defendant; and (5) whether denial of a continuance would prejudice the defendant. [Citation omitted.]" 257 Kan. at 1019.

In *Ly,* defendant sought a continuance to find a firearms expert to rebut the State's ballistics report. Ly cited *Anthony's* test to determine whether the trial court should have granted a continuance. On appeal, the *Ly* court rejected the suggestion, noting:

"Ly misapplies the test from *Anthony*. In *Anthony*, the issue was whether the court should have granted the defendant a continuance so his newly retained counsel could prepare for trial. The five-factor test considered by the *Anthony* court specifically balances a defendant's right to secure counsel of his or her choice against the court's discretionary power to deny continuances. *Anthony* is not on point. Ly did not request a continuance so he could retain new counsel. Consequently, the five-factor test from *Anthony* does not apply." 277 Kan. at 391.

Cook advocates adoption of the *Anthony* five-factor analysis for general use would give "structure" to a trial court's consideration of a request for continuance.

Cook then directs the court's attention to a four-factor analysis from *United States v. Mejia,* 69 F.3d 309, 314 (9th Cir. 1995), which had been applied by the federal court in a variety of contexts, 69 F.3d at 314 n.5. The four factors are:

" '[1] the extent of appellant's diligence in his efforts to ready his defense prior to the date set for hearing . . . . [2] how likely it is that the need for a continuance could have been met if the continuance had been granted . . . . [3] the extent to which granting the continuance would have inconvenienced the court and the opposing party, including witnesses . . . . [4] the extent to which the appellant might have suffered harm as a result of the district court's denial.' [Citation omitted.]" 69 F.3d at 314.

Cooks' appellate brief does not apply either set of factors to the facts of this case. Cook asserts that here the only reason given by

the trial court for denying a continuance was that Rudell was being held in jail and then argues that a proper balancing test would have determined that the inconvenience to Rudell was outweighed by the need for time to review the witness' mental health record and harm that would be suffered by defendant without a continuance.

First we note that the district court did not limit its consideration of a continuance to Rudell's situation. In addition, the trial court noted that both the State and the court had rearranged their schedules to accommodate Cook's insistence on an early trial setting. It then noted that the admissibility of the information defense counsel requested time to retrieve was questionable and had uncertain value and that Cook wanted Rudell present at trial.

It should be noted that in *Ly*, the court stated that a "defendant cannot establish prejudice from the trial court's denial of his or her motion for a continuance for the purposes of investigating evidence if he or she fails to investigate the evidence after the trial and submit any new evidence in a motion for a new trial." 277 Kan. 386, Syl. ¶ 2. Here, defense counsel argued the need for a continuance to obtain information on the witness' mental status from sources other than a psychological examination. Cook did not suggest any evidence that would be obtained from an investigation in his motion for a new trial.

### Denial of Motion for New Trial

Cook argues that the district court abused its discretion in denying his motion for new trial based on newly discovered evidence. In support of his motion for a new trial, defendant stated:

"1. That statements have been made in the presence of Darren Warner consistent with Leonard Smith's guilt in the death of Charles Duty;

"2. That Mr. Warner is willing to testify to being a direct witness to these statements;

"3. That the involvement of Leonard Smith in the death of Charles Duty goes directly to the heart of the defense's theory relied upon at the time of trial;

"4. That this evidence has only become known to the defendant on or about the 23rd day of April, 2004, and therefore was not available at the time of trial;

"5. That this evidence did not remain undiscovered due to a lack of due diligence on behalf of the defense's investigative efforts; and

"6. That had defendant known of this evidence at the time of trial, Mr. Warner would have been subpoenaed as a witness on behalf of the defendant and all investigative measures would have been exhausted at that time in order to present this evidence for consideration by the jury."

At a hearing on the motion for new trial, Darren Warner testified that before Thanksgiving in November 1993, he stopped in to see Delbert Smith, Leonard Smith's brother, and Delbert's wife, Carol. Delbert stated Leonard had gotten himself into trouble in connection with a body that had been pulled out of the Wakarusa River. Later, when Leonard arrived, Warner brought up the matter of the body in the river. Leonard told Warner to shut up and said he was worried he might have AIDS because he had split his knuckle hitting the victim in the head. Warner further testified that Leonard said he could not find Rudell, who was staying with a lawyer. Leonard said, if Rudell sticks with the plan, another guy would do time for the murder and Leonard would be all right. But, if Rudell changes the game plan, Leonard said, "I'm done."

Warner also testified about his conversation with Leonard, stating, "He said, 'I'm afraid that if the police get their hands on [Rudell] it ain't going to be good,' and he kind of went on and was talking about if they get their hands on him then the bitch is going to go his way, referring to Kenny Cook's wife. It was Beth." Asked how he knew that, Warner replied, "He said that, he said the bitch, and I asked him who it was and he said the guy that's doing the time for this murder or going to do time for the murder."

When questioned why he had not related the conversation earlier, Warner answered,

"Nothing ever has been brought up about it. I come back, I turned myself into the State of Oklahoma, and I come back and I was in [jail] and I was sitting there and I kind of looked at Kenny and said, 'So, you are the one doing the time for it.' And he said, 'Yeah.' And I told Kenny what I had heard and he kind of laughed."

K.S.A. 22-3501(1) provides in part that a "court on motion of a defendant may grant a new trial to him if required in the interest of justice. . . . A motion for a new trial based on the ground of newly discovered evidence may be made within two years after final judgment . . . ." An abuse of discretion standard applies to

the trial court's decision on a motion for new trial based on newly discovered evidence. *State v. Harris*, 279 Kan. 163, 176, 105 P.3d 1258 (2005). The test for determining whether a new trial is warranted on the ground of newly discovered evidence has two parts: (1) whether the defendant has met the burden of establishing that the newly proffered evidence could not with reasonable diligence have been produced at trial and (2) whether the evidence is of such materiality that it would be likely to produce a different result upon retrial. *State v. Norton*, 277 Kan. 432, 437, 85 P.3d 686 (2004).

After hearing the evidence, the trial court announced its ruling from the bench, stating:

"The Court has reviewed the motion for new trial and the evidence that was presented here this afternoon. Certainly, the motion that's been presented does qualify on the two factors that are mentioned in the statute, newly discovered evidence. I do believe this is newly discovered evidence that was not available at the time of the trial and certainly this is within two years of the final judgment. So, it does meet the base criteria. However, new trials on grounds of newly discovered evidence are not favored by the courts and such motions have to be reviewed with caution, and that's *State versus McKinney*, 272 Kan. 331[, 33 P.3d 234 (2001)]. This evidence does have to be of such materiality that there is a reasonable probability that the evidence would produce a different result upon retrial, and the credibility of that evidence is to be determined—not just later with a jury trial and jurors, but by the trial judge, and that is out of the case *State versus Thomas*, 257 Kan. 228[, 891 P.2d 417 (1995)]. Therefore, really a lot of this really does turn on what the Court viewed as Mr. Warner's credibility, and puts that directly in question and how material his testimony would be in the trial if one were granted. Certainly, there are some severe difficulties with Mr. Warner's past. He readily admits that he's had—has been convicted of over 20 crimes of dishonesty and false statement. I think also calling into question that he had access to information from Mr. Cook, so information that he's presenting he could well have gleaned and then—certainly from Mr. Cook, as far as details of the crime or newspapers. This was certainly at the time and even more recently has been a fairly widely publicized homicide.

"In reviewing Mr. Warner's credibility there is no corroborating testimony that was presented to the Court, either from someone else that he told prior to talking to Mr. Cook, not anyone that apparently he told of what he knew except from Mr. Cook, is the way I understood his testimony here today. He hadn't told wives, girlfriends, other folks about this conversation, nor do we have corroborating testimony from any other witnesses that might have access to the same information, which obviously you may not always have. Mr. Warner indicated that Leonard

Smith didn't say he shot Charles Duty. Warner indicated that he doesn't know who shot Charles Duty.

"The Court also needs to look at the testimony that was heard at the trial in this matter, and in recalling and remembering the testimony that I heard along with all of you and the witnesses and the jurors that were here, certainly I would agree with defense counsel that some of the witnesses' credibility could be questioned.

"I think one of the exceptions though is Darrin Busey, who was the former boyfriend of Elizabeth Cook. I recall in hearing his testimony, which was clear, that I think does—his credibility really, in the Court's opinion in hearing his testimony, was really not someone who had bias or reason to not tell the straight story as to what he heard from Elizabeth Cook.

"In reviewing all of the testimony I heard today and in reviewing the case law in this area the Court is going to deny the motion for a new trial."

Having determined that Cook satisfied the burden of establishing that the newly proffered evidence could not with reasonable diligence have been produced at trial, the trial court moved to the second part of the test for determining whether a new trial is warranted, *i.e.*, whether the evidence is of such materiality it likely would have produced a different result upon retrial. The trial judge first noted that Warner did not know who shot Duty and, moreover, the doubtful credibility of Warner's testimony would not likely have produced a different result.

On appeal, Cook argues that the trial court erred in passing on the credibility of the witness. Cook asserts for the purpose of the hearing that the trial court should have assumed Warner's testimony as credible, when analyzing whether that testimony was material. After conceding that Kansas case law supports the trial court's assessing the credibility of proffered new evidence, Cook argues that "many of the cases" involve a witness' recanting of trial testimony. Cook then concludes that recanted testimony should be distinguished from the circumstances of this case.

The State's reply relies on *State v. Thomas*, 257 Kan. 228, 235, 891 P.2d 417 (1995). That case does not involve a trial witness' contradicting his or her prior testimony. In *Thomas*, as in the present case, persons incarcerated with the defendant proffered exculpating testimony for Thomas. The trial court reviewed one affidavit and two written statements of three witnesses each who

claimed they saw someone other than Thomas commit the murder for which Thomas was convicted. The trial judge noted that two of the new witnesses were fellow inmates of Thomas in the El Dorado Correctional Facility. The third witness was an inmate in the Hutchinson Correctional Facility.

Thomas then argued to this court that the district court had abused its discretion in denying his motion based on the credibility of the witnesses without first conducting an evidentiary hearing. In rejecting Thomas' suggestion that the standard of review ought to be de novo in the absence of live testimony, the *Thomas* court stated: "We support the application of our well-established rule that the credibility of the evidence offered in support of a motion for a new trial is for the trial court's consideration. [Citation omitted.]" 257 Kan. at 234-35. The rule is well established, having been referred to as often repeated, and its recitation has not been restricted to cases involving recanting trial witnesses. See, *e.g.*, *State v. Ji*, 251 Kan. 3, 38, 832 P.2d 1176 (1992); *State v. Redford*, 248 Kan. 130, 131-32, 804 P.2d 983 (1991); and *Baker v. State*, 243 Kan. 1, 11, 755 P.2d 493 (1988).

### Failure to Calculate Sentence Under Sentencing Guidelines

Cook argues that the trial court erred in failing to calculate defendant's sentence under the sentencing guidelines. K.S.A. 21-4724(f) provides that the sentencing court "shall compute the appropriate sentence had the person been sentenced pursuant to the Kansas sentencing guidelines." Cook was convicted of murdering Duty in September 1992. The retrial occurred in August 2003. In cases where a crime was committed prior to July 1, 1993, and sentencing occurs after that date, the trial court must impose a sentence according to the pre-July 1, 1993, law. *State v. Fierro*, 257 Kan. 639, Syl. ¶ 4, 895 P.2d 186 (1993).

Cook states that when the trial court "checked" the Kansas sentencing guidelines to determine his sentence, it failed to "officially" compute and record what the sentence would have been under the guidelines. Citing *State v. Corber*, 21 Kan. App. 2d 325, 327, 900 P.2d 241 (1995), Cook contends that under such circumstances, a remand is required for computation of his sentence.

Examination of the record of the trial judge's remarks at the time of sentencing reveals that the appropriate sentence under the sentencing guidelines was computed and is a part of the record. We note that the trial judge stated:

"I have to sentence you based on the law that was in effect at the time that Mr. Duty was killed. I might add that this is probably certainly to your benefit because under our Sentencing Guidelines, and I don't know if you have calculated what your sentence would be, but I did, and I think you would be serving a ton more time than—in some ways, at least you would know how much time you are serving, and I think if I'm correct on your criminal history I calculated that to be somewhere between 46 and 51 years. And I may be wrong on that, but I believe that it's pretty close based on a second-degree murder conviction with two prior person felony convictions."

The State points out there was no objection to the sentencing court's statement that Cook had two prior person felony convictions. Under these facts, intentional second-degree murder is a severity level 1 person felony. K.S.A. 21-3402(a). With two prior person felonies, Cook's criminal history category is B. See K.S.A. 2005 Supp. 21-4704. On the grid, the sentencing range is from 554 months (46.2 years) to 618 months (51.5 years). K.S.A. 2005 Supp. 21-4704.

### Enhancement of Cook's Sentence

Cook argues the district court enhanced his sentence in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

Cook's argument on this issue is similar to his argument on the previous issue; it is built on a false premise. In the previous issue, Cook argued that the trial court's failure to compute the sentencing guidelines sentence was error. The record indicates the trial court had computed the sentencing guidelines prior to sentencing. Cook argues that the trial court improperly enhanced his sentence beyond the prescribed statutory maximum. We find that the trial court did not enhance his sentence beyond the statutory maximum.

K.S.A. 21-4501(b) provides that the sentence for Class B felonies, which includes the crime Cook was convicted of, committed before July 1, 1993, "shall be an indeterminate term of imprison-

ment, the minimum of which shall be fixed by the court at not less that five years nor more than 15 years and the maximum of which shall be fixed by the court at not less than 20 years nor more than life." The trial court properly sentenced Cook to an indeterminate term of imprisonment for 15 years to life, the statutory maximum.

Affirmed.